**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
        *Plaintiff-Appellee,*

v.

HENRY MICHAEL HOUSTON,
        *Defendant-Appellant.*

No. 07-50478

D.C. No.
CR-02-00938-
DOC-031

UNITED STATES OF AMERICA,
        *Plaintiff-Appellee,*

v.

WAYNE BRIDGEWATER, also known
as Seal M (13),
        *Defendant-Appellant.*

No. 08-50165

D.C. No.
2:02-cr-00938-
DOC-13

OPINION

Appeal from the United States District Court
for the Central District of California
David O. Carter, District Judge, Presiding

Argued and Submitted
March 8, 2011—Pasadena, California

Filed August 3, 2011

Before: Pamela Ann Rymer, Consuelo M. Callahan, and
Sandra S. Ikuta, Circuit Judges.

Opinion by Judge Rymer

10055

## COUNSEL

John C. Lemon, San Diego, California, for defendant-appellant Henry Michael Houston.

William S. Harris, Law Offices of Wm. S. Harris, South Pasadena, California, for defendant-appellant Wayne Bridgewater.

Stephen G. Wolfe, Assistant United States Attorney, Santa Ana, California (argued); Terri K. Flynn, Assistant United States Attorney, Santa Ana, California, for the plaintiff-appellee.

## OPINION

RYMER, Circuit Judge:

Henry Michael Houston and Wayne Bridgewater were jointly tried and convicted of a substantive Racketeer Influenced and Corrupt Organizations Act (RICO) violation, 18 U.S.C. § 1962(c); RICO conspiracy, 18 U.S.C. § 1962(d); and two counts of violent crimes in aid of racketeering activity (VICAR), 18 U.S.C. § 1959, arising out of their membership in the Aryan Brotherhood (AB). Each was sentenced to life in

prison without possibility of parole. They appeal, raising *Brady*[1] and *Napue*[2] issues, and claiming instructional error. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm.

I

A

For some time prior to August 28, 1997, racial tension between the Aryan Brotherhood[3] and DC Blacks[4] prison gangs had been growing at the United States Prison at Lewisburg. On the morning of August 28, Bridgewater, an AB member, and Al Benton, a member of the AB's three-person governing Commission for federal prisons, opened a letter from Tyler Bingham, another AB federal commissioner. The letter contained invisible ink that, when heated, revealed the phrase "War with DC Blacks." At 10:53 A.M., Benton called Ronnie Slocum, who had forwarded the letter, to find out why the AB was now at war with the DC Blacks. Afterwards, Benton started to plan an assault on the DC Blacks.

Benton testified that around noon, he mentioned the war to Houston, an AB recruit. Houston told Benton, "I'm with you." Houston never expressed any hesitation about killing DC Blacks members. Benton testified that if Houston had attempted to withdraw from the plan, he would have killed him for disobedience. Meanwhile, Bridgewater, on his own initiative, recruited two more inmates, John Campbell and Jason Schwyhart, for the assault.

---

[1]*Brady v. Maryland*, 373 U.S. 83 (1963).

[2]*Napue v. Illinois*, 360 U.S. 264, 269 (1959).

[3]For a description of the Aryan Brotherhood prison gang, *see United States v. Bingham*, ___ F.3d ___ (9th Cir. 2011).

[4]The DC Blacks was a group of predominately black inmates from the Washington, D.C. area.

After lunch, Benton, Houston, Bridgewater, Campbell, and Schwyhart met to discuss the killings. They noticed a small hitch — that Benton, Bridgewater, Campbell, and Schwyhart were housed in A Unit and Houston in B Unit. Inmates could not freely travel between the units. As a solution, Houston offered to kill DC Blacks members in B Unit by himself. Benton rejected this as too dangerous because Houston would be outnumbered. Instead, Benton planned to sneak Houston into A Unit. Benton testified that he succeeded in getting Houston into A unit around 4:30 to 5:00 P.M. A prison guard confirmed that Houston was in A Unit (including in Benton's cell) after the murders. Also, a security camera recorded Houston moving from B Unit to A Unit around 6:24 P.M.

At night, Benton, Bridgewater, Houston, Campbell, and Schwyhart met in Benton's room. Each armed himself with a knife-like weapon. Then they split into two groups, one composed of Houston and Benton, and the other of Bridgewater, Campbell, and Schwyhart. Benton ordered Bridgewater to kill a specific DC Black member, which Bridgewater refused to do because he knew the man too well. Benton then ordered him to kill a man named "Red." Bridgewater again did not go through with the murder because Red was in the shower. At this point, Benton became upset at Bridgewater's reluctance to kill.

Not wanting to deal with Bridgewater any longer, Benton went off with Houston to kill Abdul Salaam. Benton initially stabbed Salaam through the throat. Houston then joined in the stabbing and in the process accidentally struck Benton. Salaam suffered thirty-four stab wounds, sixteen of which were fatal. After the killing, Houston threw both his and Benton's knives out the window, an act which Benton testified prevented him from killing more DC Blacks members. A DNA report found that Salaam's blood was on Benton's clothes and knife, but did not specify whether Salaam's blood was on Houston's clothes and knife.

Meanwhile Bridgewater, Campbell, and Schwyhart attacked Frank Joyner. Ball, another inmate, saw Bridgewater stab Joyner, who suffered thirty-five stab wounds, six of which were fatal. Shortly afterwards, Schwyhart stabbed Ball.

B

The jury convicted Houston of a substantive RICO violation and RICO conspiracy, 18 U.S.C. §§ 1962(c), (d), based on the predicate acts of a conspiracy to murder black inmates in violation of Cal. Penal Code §§ 182, 187, and the murder of Abdul Salaam in violation of 18 Pa. Cons. Stat. §§ 306, 2502. He was also convicted as a co-conspirator on two counts of VICAR murder, 18 U.S.C. § 1959, for the murders of Frank Joyner and Abdul Salaam.

Bridgewater was found guilty of a substantive RICO violation and a RICO conspiracy based on the predicate acts of a conspiracy to murder black inmates in violation of Cal. Penal Code §§ 182, 187; and the murders of Frank Joyner and Abdul Salaam, and the attempted murder of Titus Webster, all in violation of 18 Pa. Cons. Stat. §§ 306, 901, 2502. Bridgewater was also convicted as a direct participant and co-conspirator in the VICAR murder of Joyner and as a co-conspirator in the VICAR murder of Salaam.

Each received a sentence of life in prison without parole. Both timely appeal their convictions.

II

On the last day of its case, the government called Irvin McConaghy, a jailhouse informant. Before trial, the government had disclosed a report of three interviews of McConaghy by Special Agent Michael Halualani on April 13, 2005, January 29, 2006, and January 16, 2007. During these interviews, McConaghy stated that Houston had told him "if the BOP lets [me] out of the Control Unit [I am] going to con-

tinue killing DC Blacks 'until they kill [me].' " On April 13, 2007, several days before McConaghy took the stand, the prosecution emailed the defense that McConaghy was now expected to testify that Houston "actually stated he is going to continue killing 'niggers' referring to the DC Blacks." At trial, McConaghy gave testimony along these lines: "[Houston] said if the government doesn't give him the death penalty for what they did to those niggers in Lewisburg, then as soon as he gets out of the control unit, he will kill more niggers, and he's going to continue to kill until someone kills him."

On cross-examination, the defense questioned McConaghy about his appearance in other proceedings in which he did not mention Houston. McConaghy testified in a different trial in 2004 that he had information about Campbell, but said nothing about Houston. He also testified before the grand jury in this case on April 13, 2005, but talked only about Campbell. This line of inquiry implied that McConaghy had made up Houston's statement after his deal to testify against Campbell fell through because of Campbell's death. McConaghy acknowledged that he "probably" found out Campbell died after his testimony in 2004 and 2005, but testified that he had told Pennsylvania-based Assistant United States Attorney (AUSA) Fred Martin about Houston's statement during an interview in 2003. This testimony surprised the prosecuting AUSA, who called Martin for his interview notes during the first break and turned them over to the defense while McConaghy was still on the stand. Martin's notes reflect nothing about Houston. The defense then cross-examined McConaghy based on the notes, suggesting that he was lying when he said that he had told AUSA Martin about Houston because the interview notes didn't say so. Houston's counsel made these same points during closing.

After a failed effort to arrive at a stipulation as to what Martin's testimony would be, the defense subpoenaed him to testify but did not call him as a witness until the penalty phase. Martin testified at that point that he did not recall

whether McConaghy told him anything about Houston. Martin testified it was possible, but "fairly unlikely," that he would have failed to record McConaghy's statement about Houston, if McConaghy had made it. He also indicated that in 2003 he had told an AUSA in the United States Attorney's Office for the Central District of California that McConaghy could be a useful witness, primarily against Campbell. Finally, Martin testified that, once the issue surfaced at trial, he told the prosecuting AUSA that he didn't recall McConaghy saying anything about Houston. He denied telling her that McConaghy did not say any such thing.

Houston and Bridgewater argue that the government violated *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to disclose McConaghy's anticipated testimony, Martin's 2003 interview notes, and Martin's recollection of the interview.[5] They also contend that the government knowingly presented perjured testimony by McConaghy in violation of *Mooney v. Holohan*, 294 U.S. 103, 112 (1935), and *Napue*, 360 U.S. at 269. At the very least, they submit, the government failed to fulfill its duty to investigate the truthfulness of McConaghy's testimony.

We review for plain error whether the government failed to disclose exculpatory evidence and knowingly presented perjured testimony because these claims were not presented to the district court. *See United States v. Guzman-Padilla*, 573 F.3d 865, 890 (9th Cir. 2009); *United States v. Zuno-Arce* (*Zuno-Arce I*), 44 F.3d 1420, 1422 (9th Cir. 1995). "Plain error requires an (1) error, (2) that is plain, and (3) that affects substantial rights." *United States v. Delgado*, 357 F.3d 1061, 1065 (9th Cir. 2004) (internal quotations omitted). Even assuming these conditions are met, we only exercise our discretion to fix the error if it "seriously affects the fairness,

---

[5]The argument is primarily Houston's, but Bridgewater joins on the premise that his conviction was tainted by admission of the false testimony. We do not need to decide this given our disposition.

integrity, or public reputation of judicial proceedings." *Id.* (internal quotations omitted).

### A

**[1]** The government has a duty under *Brady* to disclose exculpatory and impeaching evidence. To receive a new trial because of a *Brady* violation, a defendant must show: "(1) the evidence was exculpatory or impeaching; (2) it should have been, but was not produced; and (3) the suppressed evidence was material to his guilt or punishment. Evidence is material under *Brady* only if there is a reasonable probability that the result of the proceeding would have been different had it been disclosed to the defense." *United States v. Antonakeas*, 255 F.3d 714, 725 (9th Cir. 2001) (internal citations and quotations omitted). However, there is no *Brady* violation so long as the exculpatory or impeaching evidence is disclosed at a time when it still has value. *See United States v. Vgeri*, 51 F.3d 876, 880 (9th Cir. 1995) (impeaching evidence disclosed during trial was still valuable because the defense could use it on cross-examination); *United States v. Gordon*, 844 F.2d 1397, 1403 (9th Cir. 1988) (impeaching evidence disclosed after a witness had finished testifying did not constitute a *Brady* violation because the court had offered to recall the witness for further cross-examination in light of the new impeaching evidence).

**[2]** Here, the government disclosed McConaghy as a witness and his expected testimony well in advance of the trial. The government also turned over AUSA Martin's notes from his interview with McConaghy during trial but while cross-examination was on-going. At this point, the notes still had evidentiary value to the defense because they could be used — and were used — during cross examination. *See Vgeri*, 51 F.3d at 880. Failing to disclose Martin's recollection of the interview (*i.e.*, no memory of McConaghy mentioning Houston's statement) was not material because it was substantially similar to the more powerful evidence that the defense had

and had already used — Martin's notes recorded nothing about a Houston confession. *See Lopez v. Ryan*, 630 F.3d 1198, 1210 (9th Cir. 2011). In these circumstances, we see no plain *Brady* error.

B

**[3]** A conviction obtained using knowingly perjured testimony violates due process, even if the witness's perjured testimony goes only to his credibility as a witness and not to the defendant's guilt. *Mooney*, 294 U.S. at 112; *Napue*, 360 U.S. at 269. The government's failure to correct testimony that it later learns is perjured is also a *Mooney-Napue* violation. *Hayes v. Brown*, 399 F.3d 972, 978 (9th Cir. 2005) (en banc). To prevail on a *Mooney-Napue* claim, the defendant must show that "(1) the testimony . . . was actually false, (2) the prosecution knew or should have known that the testimony was actually false, and (3) that the false testimony was material." *United States v. Zuno-Arce* (*Zuno-Arce II*), 339 F.3d 886, 889 (9th Cir. 2003). "In assessing materiality under *Napue*, we determine whether there is any reasonable likelihood that the false testimony could have affected the judgment of the jury; if so, then the conviction must be set aside. Under this materiality standard, the question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Hayes*, 399 F.3d at 984 (internal quotations and citations omitted). However, "if it is established that the government knowingly permitted the introduction of false testimony reversal is virtually automatic." *Id.* at 978 (internal quotations omitted).

**[4]** Houston and Bridgewater maintain that McConaghy committed perjury by falsely testifying that Houston had confided in him, and that he had told AUSA Martin of Houston's statement. They have, however, failed to show that

McConaghy's testimony was "actually false" or that the government knowingly presented false testimony.

As to the "confiding" statement, Houston and Bridgewater at most point to evidence creating an inference of falsity: McConaghy may only have implicated Houston after Campbell's death, which gave him an incentive to lie; McConaghy failed to mention Houston's statement during previous testimony; and McConaghy may not have relayed Houston's statement in the only interview that took place before Campbell died. The earlier omissions were, in effect, prior inconsistent statements in that McConaghy had (implicitly) represented that he had no information on Houston whereas at trial, McConaghy testified that Houston had confided in him. These inconsistencies were fully explored and argued to the jury. Beyond this, no record was developed about the government's use of perjured testimony. This leaves no basis upon which to conclude that the "confiding" statement was perjured testimony knowingly used.

**[5]** With respect to McConaghy's interview with Martin, AUSA Martin testified during the penalty phase that it was possible but "fairly unlikely" that McConaghy had told him about Houston's statement, because if McConaghy had told him, he would have recorded it in his notes. Martin's testimony certainly rasies a question about McConaghy's credibility, but it does not establish that McConaghy lied, or that the government knowingly presented false testimony. Regardless, there is not a "reasonable likelihood" that McConaghy's statement "affected the judgment of the jury." *Hayes*, 399 F.3d at 984. Defense counsel effectively attacked McConaghy's credibility. They argued that Martin's notes showed McConaghy had never mentioned Houston's statement to Martin, and that McConaghy may have fabricated Houston's statement after Campbell's death. Additionally, there was overwhelming evidence that Houston and Bridgewater participated in the Lewisburg murders: their leader, Al Benton, testified against them; an eyewitness saw Bridgewater repeatedly stab an

inmate; and prison guards found both of them covered in blood after the murders. Consequently, our confidence in the verdict is not undermined.

Finally, no reason appears for a new trial on the asserted ground that the government failed to investigate whether McConaghy lied. Houston and Bridgewater identify nothing else the government could have done. It provided the Halualani interview report; turned over AUSA Martin's notes; and made Martin available to testify, once McConaghy's interview with him came to the fore. This differs from prior cases where a new trial was ordered due to the government's failure to investigate, because in those cases, the government failed to investigate obvious leads. *See*, *e.g.*, *N. Mariana Islands v. Bowie*, 243 F.3d 1109, 1117-19 (9th Cir. 2001) (government prosecutors did not investigate a letter which suggested a conspiracy by multiple perpetrators to commit perjury and blame a single person); *United States v. Bernal-Obeso*, 989 F.2d 331, 332-33, 335-36 (9th Cir. 1993) (without further investigation, it was unclear whether an informant lied to the government about his criminal record or whether it was a miscommunication); *see also Morris v. Ylst*, 447 F.3d 735, 743-46 (9th Cir. 2006) (the government failed to investigate notes which indicated a witness had lied, but the error was not prejudicial).

III

Bridgewater and Houston requested instructions on duress, which the district court rejected because they were unsupported by the evidence. *See United States v. Slocum*, 486 F. Supp. 2d 1104, 1115-19 (C.D. Cal. 2007). For the predicate acts controlled by Pennsylvania law, the district court held that Bridgewater and Houston recklessly placed themselves in Benton's presence on the night of the murders. Both had opportunities throughout the day to escape by sequestering themselves in their cells or going to the guards for help. As such, neither was eligible for a duress instruction under Penn-

sylvania law. *Id.* at 1115-16; *see also* 18 Pa. Cons. Stat. § 309(b). Regarding the VICAR murder charges controlled by federal law, the district court assumed, without deciding, that duress was available as a defense but held that Bridgewater and Houston had failed to make a *prima facie* case for the applicability of a duress defense because any threat from Benton was not imminent and both had a reasonable opportunity to escape. *Id.* at 1118-19.

Houston and Bridgewater submit that the district court should have given their proposed duress instructions for the predicate acts of murder in violation of Pennsylvania law, for the predicate act of conspiracy to commit murder in violation of California law, and for the VICAR murder and RICO conspiracy charges. In support, they point to evidence that Benton would have killed them if they refused to participate.

[6] We review for abuse of discretion the district court's denial of a requested jury instruction as unsupported by the evidence. *United States v. Daane*, 475 F.3d 1114, 1119 (9th Cir. 2007). For the substantive RICO charge, state law governs the substantive defenses to the predicate racketeering acts. *See United States v. Muskovsky*, 863 F.2d 1319, 1330-31 (7th Cir. 1988); *see also United States v. Bertman*, 686 F.2d 772, 774 (9th Cir. 1982) (state substantive defenses incorporated into federal Travel Act). That is, California law governs the availability of a duress defense for the predicate racketeering act of conspiracy to commit murder in violation of Cal. Penal Code §§ 182, 187, and Pennsylvania law governs the availability of the defense for the predicate racketeering act of murder and attempted murder in violation of 18 Pa. Cons. Stat. §§ 306, 901, 2502. Federal law governs the availability of the defense for the RICO conspiracy and VICAR murder charges.

"[A] defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor." *Mathews v. United*

*States*, 485 U.S. 58, 63 (1988). "The legal standard is generous: a defendant is entitled to an instruction concerning his theory of the case if the theory is legally sound and evidence in the case makes it applicable, even if the evidence is weak, insufficient, inconsistent, or of doubtful credibility. A defendant needs to show only that there is evidence upon which the jury could rationally sustain the defense." *United States v. Kayser*, 488 F.3d 1070, 1076 (9th Cir. 2007) (internal citation and quotations omitted).

**[7]** Assuming (without deciding) a duress defense is available, the district court did not abuse its discretion in refusing to give a duress instruction under California, Pennsylvania, or federal law because the evidence did not support such an instruction.[6] To receive a duress instruction under federal law, the defendants must present a *prima facie* case on three elements: "(1) an immediate threat of death or serious bodily injury, (2) a well-grounded fear that the threat will be carried out, and (3) lack of a reasonable opportunity to escape the threatened harm." *United States v. Vasquez-Landaver*, 527 F.3d 798, 802 (9th Cir. 2008) (internal quotations omitted). Houston and Bridgewater failed to make such a showing on the immediacy and lack-of-escape prongs.

**[8]** "The element of immediacy requires some evidence that [death or serious bodily injury] was present, immediate

---

[6]We do not need to decide whether duress is ever available as a defense to conspiracy to commit murder under California or federal law because we conclude that the district court did not abuse its discretion in finding that a duress instruction was, in any event, unsupported by the evidence. *See Dixon v. United States*, 548 U.S. 1, 6-7 & n.4 (2006) (duress may negate the mens rea for certain crimes); *United States v. LaFleur*, 971 F.2d 200, 204-06 (9th Cir. 1991) (duress is not a defense to federal first degree murder); *People v. Vieira*, 106 P.3d 990, 1005-06 (Cal. 2005) (duress is not a defense to murder or attempted murder under California law, but noting that California has yet to decide whether duress is a defense to conspiracy to commit murder). Duress is a defense to first degree murder under Pennsylvania law, however. *See Commonwealth v. Markman*, 916 A.2d 586, 606 (Pa. 2007).

or impending." *United States v. Atencio*, 586 F.2d 744, 746 (9th Cir. 1978) (per curiam). Houston and Bridgewater rely on Benton's testimony that he would have killed them if they hadn't participated in the murders, but this was at most a threat of future harm. In fact, when Bridgewater twice refused to kill as ordered, Benton did not attempt to punish Bridgewater immediately; he only became angry and ordered him to kill a different inmate. Threats of non-imminent, future harm do not support a duress instruction. *See United States v. Becerra*, 992 F.2d 960, 964 (9th Cir. 1993); *United States v. Shapiro*, 669 F.2d 593, 596-97 & n.3 (9th Cir. 1982); *Atencio*, 586 F.2d at 747.

Bridgewater and Houston also failed to avail themselves of alternatives to committing a crime, such as escape or contacting the authorities. *See United States v. Karr*, 742 F.2d 493, 497 (9th Cir. 1984); *Atencio*, 586 F.2d at 747. They could have sought protective custody, or a transfer, or taken refuge in their own cell, but did not. *See United States v. Wood*, 566 F.2d 1108, 1109 (9th Cir. 1977) (per curiam). Houston and Bridgewater were separated from Benton throughout the day but instead of taking any of these precautions, Bridgewater chose to recruit Campbell and Schwyhart for the murders, and Houston, when alone in B Unit, chose to sneak back into A Unit so he could participate in the murders.

**[9]** California law mirrors federal law in that a defendant must show an immediate danger and a lack of opportunity to escape in order for the jury to be instructed on a duress defense. *See People v. Vieira*, 106 P.3d 990, 1006 (Cal. 2005) ("The common characteristic of all the decisions upholding a duress defense lies in the immediacy and imminency of the threatened action: each represents the situation of a present and active aggressor threatening immediate danger; none depict a phantasmagoria of future harm." (internal quotations and alteration marks omitted)); *In re Arnoff*, 586 P.2d 960, 964 (Cal. 1978) (rejecting a duress defense where there was "no persuasive evidence [the defendant] made serious effort

to terminate his association with [the source of duress] or to bring his situation to the attention of any authority"); *People v. Petznick*, 7 Cal. Rptr. 3d 726, 736 (Cal. Ct. App. 2003). Thus, Houston and Bridgewater were not entitled to a duress instruction under California law for the same reasons they were not entitled to one under federal law: the threat was not immediate, and both had opportunities to escape.

Pennsylvania law is somewhat different. A defendant is entitled to a duress defense where he commits a crime "because he was coerced to do so by the use of, or a threat to use, unlawful force against his person or the person of another, which a person of reasonable firmness in his situation would have been unable to resist." 18 Pa. Cons. Stat. § 309(a). "[T]o establish the duress defense under Section 309, unlike under the common law rule, the force or threatened force does not need to be of present and impending death or serious bodily injury. Instead, the relevant inquiry under Section 309 is whether the force or threatened force was a type of unlawful force that a person of reasonable firmness in the defendant's situation would have been unable to resist." *Commonwealth v. DeMarco*, 809 A.2d 256, 262 (Pa. 2002) (internal quotations and alteration marks omitted) (emphasis removed). There is, however, an exception to § 309(a). "The defense . . . is unavailable if the actor recklessly placed himself in a situation in which it was probable that he would be subjected to duress." 18 Pa. Cons. Stat. § 309(b).

Pennsylvania courts recognize that the § 309(b) exception to the duress defense applies as a matter of law when a defendant "entirely remove[s] himself from the alleged coercer's influence . . . and then [ ] voluntarily return[s] to a location where he [knows] that a violent crime" will take place. *Commonwealth v. Markman*, 916 A.2d 586, 609 (Pa. 2007); *see also Commonwealth v. Pelzer*, 612 A.2d 407, 413-14 (Pa. 1992) (plurality) (duress defense unavailable to a defendant who repeatedly failed to avail himself of opportunities to withdraw from a kidnapping conspiracy).

**[10]** We believe that a Pennsylvania court would hold that § 309(b) excludes a duress defense as a matter of law in this case. Both Bridgewater and Houston "entirely removed" themselves from Benton — Bridgewater recruited inmates for the conspiracy and Houston went to his cell in B Unit. At that time, both knew Benton was planning to murder DC Blacks. Notwithstanding this, both "voluntarily returned to a location where [they] knew that a violent crime was in progress." *See Markman*, 916 A.2d at 609.

IV

Houston and Bridgewater argue that the VICAR murder instructions erroneously omitted the requirement that the murder be "for the purpose of gaining entrance to or maintaining or increasing position" in the AB, *see* 18 U.S.C. § 1959(a), and failed to identify the predicate conspiracy for co-conspirator liability. We review the VICAR murder instructions for plain error because neither objected to them.

"In reviewing jury instructions, the relevant inquiry is whether the instructions as a whole are misleading or inadequate to guide the jury's deliberation." *United States v. Garcia-Rivera*, 353 F.3d 788, 792 (9th Cir. 2003) (internal quotations omitted). "The trial court has substantial latitude so long as its instructions fairly and adequately cover the issues presented." *United States v. Hicks*, 217 F.3d 1038, 1045 (9th Cir. 2000) (internal quotations omitted). "A single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." *United States v. Frega*, 179 F.3d 793, 806 n.16 (9th Cir. 1999).

**[11]** Paragraph 8 of Instruction No. 34 told the jury that an element of VICAR murder was acting for the purpose of position in the AB. It instructed that to convict, the jury must find that the government has established beyond a reasonable doubt:

5. Someone committed the first degree murder(s) of [Frank Joyner, for Count 6; or Abdul Salaam for Count Seven].

7. Defendant(s)

    A. Aided and abetted the first degree murders . . . , or

    B. Have co-conspirator liability for the first degree murders . . . , or

    C. Both (A) and (B) above.

8. Defendant(s) did so for the purpose of gaining entrance to, increasing, or maintaining his position in the enterprise.

Instruction No. 36 further directed that the jury could convict the defendants of VICAR murder on a *Pinkerton* theory. *Pinkerton v. United States*, *328 U.S. 640 (1946). Under Pinkerton*, Houston and Bridgewater could be criminally liable as a co-conspirator if "(1) the [VICAR murder] was committed in furtherance of the conspiracy; (2) the [VICAR murder] fell within the scope of the unlawful project; and (3) the [VICAR murder] could reasonably have been foreseen as a necessary or natural consequence of the unlawful agreement." *See United States v. Chong*, 419 F.3d 1076, 1081 (9th Cir. 2005) (internal quotations omitted).

[12] The district court properly instructed the jury on each of the three elements of *Pinkerton* liability. The defendants have provided no support for their argument that the instructions must specify the predicate conspiracy, and we see no plain error in failing to do so. Nor was giving a *Pinkerton* instruction for VICAR murder plainly erroneous. The First Circuit approved a *Pinkerton* instruction in similar circumstances in *United States v. Tse*, 135 F.3d 200 (1st Cir. 1998).

There, the defendant also argued that a *Pinkerton* instruction was improper for VICAR murder because it would leave out the mens rea element that the defendant act "for the purpose of gaining entrance to or maintaining or increasing position in an enterprise." 18 U.S.C. § 1959(a); *Tse*, 135 F.3d at 206. The court rejected this argument because it "ignores the precept on which *Pinkerton* liability is based, that the necessary 'criminal intent to do the act is established by the formation of the conspiracy.' " *Id.* at 206-07 (quoting *Pinkerton*, 328 U.S. at 647)). The court further noted that the jury was required to find that the defendant possessed the requisite intent — acting for the purpose of maintaining position — when he entered into the conspiracy. Therefore, "all foreseeable crimes committed by the conspiracy [could] be attributed to that intent." *Id.* at 207. We agree.

**[13]** As in *Tse*, the jury here was required to find that Houston and Bridgewater had the requisite intent of gaining, maintaining, or increasing position in the AB. Houston and Bridgewater suggest that Instruction No. 36 confused the issue by stating that "it is not necessary that the defendant personally act for the purpose of gaining entrance to, maintaining or increasing his position in the enterprise." However, this simply means that Bridgewater and Houston need not themselves have participated in the actual Joyner and Salaam murders to maintain or increase their positions in the AB, but as Instruction No. 34 makes clear, they were nevertheless required to have that intent when they entered into the conspiracy.[7] That is not plainly an improper basis for conviction of VICAR murder under *Pinkerton*.

---

[7]Even if the statement in Jury Instruction No. 36 that "it is not necessary that the defendant personally act for the purpose of gaining entrance to, maintaining or increasing his position in the enterprise, as it would be for guilt based on aiding and abetting," were interpreted as being inconsistent with Instruction 34's requirement that the defendant have acted for the purpose of gaining entrance to, increasing, or maintaining his position in the AB for purposes of VICAR liability, any instructional error would be

V

Houston and Bridgewater requested an instruction allowing the jury to find second degree murder as the predicate murder offense in the VICAR murder charges. They posit that, had the jury found second degree murder as the predicate offense, it would have been forced to acquit because VICAR murder cannot be predicated on second degree murder. The district court rejected this request, holding that Bridgewater and Houston would have been guilty of VICAR murder even if the jury had found second degree murder as the predicate offense instead of first degree murder. As such, the second degree murder instruction would have been spurious. *See Slocum*, 486 F. Supp. 2d at 1114-15 n.6.

**[14]** The instruction they sought is not a typical lesser-included-offense instruction; rather, it is a lesser-included-*predicate*-offense instruction. Every circuit to have entertained this argument has rejected it. *See United States v. Fowler*, 535 F.3d 408, 421 (6th Cir. 2008) ("[T]here is no such thing as a lesser-included-predicate-act instruction."); *United States v. Nguyen*, 255 F.3d 1335, 1340 (11th Cir. 2001); *United States v. Forsythe*, 594 F.2d 947, 952 (3d Cir. 1979). We join them.

The Third Circuit's opinion in *Forsythe* is particularly persuasive. There, the defendants argued that the district judge should have instructed the jury that it could find state misdemeanors as the RICO predicate racketeering acts, in addition to the state felonies that were listed. Further, the defendants argued that if the jury did find state misdemeanors as the

harmless in light of the overwhelming and uncontradicted evidence at trial that Houston and Bridgewater conspired to commit VICAR murder for the purpose of gaining entrance to, increasing, or maintaining their positions in the AB, including Benton's testimony that both men were willing and eager participants in the attacks on DC Blacks. *See United States v. Anchrum*, 590 F.3d 795, 801 (9th Cir. 2009).

predicate offenses, it had to acquit because only state felonies may be predicate racketeering acts. The Third Circuit reasoned that this argument was contrary to the purpose of the lesser-included-offense doctrine, explaining: "The purpose of an instruction on a lesser included offense is to give the defendant the benefit, not of the possibility that the jury will find him not guilty, but rather of the additional possibility that it may find him guilty of an offense carrying a less severe sentence." *Forsythe*, 594 F.2d *at 952; see also Beck v. Alabama*, 447 U.S. 625, 633 (1980) (A lesser included offense instruction serves as a benefit "to the defendant because it affords the jury a less drastic alternative than the choice between conviction of the offense charged and acquittal."). For the same reason, Houston and Bridgewater fail to convince us that second degree murder should have been included as a possible predicate offense for the VICAR murder charges, and if the jury found second degree murder as the predicate offense, they must be acquitted.

AFFIRMED.