NOT FOR PUBLICATION

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

**FILED**

JUL 18 2023

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| UNITED STATES OF AMERICA, Plaintiff-Appellee, v. DALIBOR KABOV, AKA Dabo, AKA Dalibor Dabo Kabov, Defendant-Appellant. | No. 19-50083 D.C. No. 2:15-cr-00511-DMG-2 MEMORANDUM* |

| | |
|---|---|
| UNITED STATES OF AMERICA, Plaintiff-Appellee, v. BERRY KABOV, Defendant-Appellant. | No. 19-50089 D.C. No. 2:15-cr-00511-DMG-1 |

Appeal from the United States District Court
for the Central District of California
Dolly M. Gee, District Judge, Presiding

Argued and Submitted October 19, 2022
Pasadena, California

---

\* This disposition is not appropriate for publication and is not precedent except as provided by Ninth Circuit Rule 36-3.

Before: WARDLAW, CHRISTEN, and BUMATAY, Circuit Judges.[**]

Defendants Dalibor and Berry Kabov appeal their convictions for drug trafficking, money laundering, and tax-related offenses.[1] We have jurisdiction pursuant to 28 U.S.C. § 1291. We vacate defendants' drug importation convictions (Counts 5 through 8 of the indictment), and remand for the district court to apply the Supreme Court's decision in *Ruan v. United States*, 142 S. Ct. 2370 (2022) in the first instance. We affirm on all other grounds.

## I. *Napue*, *Brady*, and Rule 33 Challenges

## A. Legal Standards

Defendants raise a litany of claims based on *Napue v. Illinois*, 360 U.S. 264, 269 (1959), *Brady v. Maryland*, 373 U.S. 83 (1963), and Federal Rule of Criminal Procedure 33. We review de novo *Napue* and *Brady* claims. *United States v. Rodriguez*, 766 F.3d 970, 980 (9th Cir. 2014). We review the district court's factual determinations concerning *Napue* claims for clear error. *United States v. Renzi*, 769 F.3d 731, 751–52 (9th Cir. 2014). We review for an abuse of discretion the denial of a Rule 33 motion for a new trial based on newly discovered evidence.

---

[**] Judge Wardlaw was randomly selected as a replacement judge for Judge Kleinfeld on this case. Judge Wardlaw has reviewed the briefs and record in this case and has viewed the recording of the oral argument held on October 19, 2022.

[1] For clarity purposes, we refer to each defendant by his first name when necessary to distinguish between them.

*United States v. Hinkson*, 585 F.3d 1247, 1259 (9th Cir. 2009) (en banc).

To establish a *Napue* violation, a defendant must show: (1) testimony or evidence presented at trial was "actually false" or misleading; (2) the government knew or should have known that it was false; and (3) the testimony was material, meaning there is a "reasonable likelihood that the false testimony *could* have affected the judgment of the jury." *Renzi*, 769 F.3d at 751 (emphasis added) (quoting *United States v. Houston*, 648 F.3d 806, 814 (9th Cir. 2011)). Testimony is not "actually false" merely because the witness's recollection is "mistaken, inaccurate[,] or rebuttable." *Henry v. Ryan*, 720 F.3d 1073, 1084 (9th Cir. 2013); *see Renzi*, 769 F.3d at 752. But testimony that, "taken as a whole," leaves the jury with a "false impression" will satisfy *Napue*'s first prong. *Alcorta v. Texas*, 355 U.S. 28, 31 (1957) (per curiam).

To establish a *Brady* claim, a defendant must show that: (1) the evidence at issue was favorable to the accused, either because it was exculpatory or because it was impeaching; (2) it was suppressed by the prosecution, either willfully or inadvertently; and (3) it was material. *See Strickler v. Greene*, 527 U.S. 263, 281–82 (1999). Evidence is material for *Brady* purposes "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding *would* have been different." *Ochoa v. Davis*, 16 F.4th 1314, 1327 (9th Cir. 2021) (emphasis added) (quoting *United States v. Bagley*, 473 U.S. 667, 682

(1985) (opinion of Blackmun, J.)).

Federal Rule of Criminal Procedure 33 permits the district court to vacate a judgment and grant a new trial based on newly discovered evidence when the "interest of justice so requires." Fed. R. Crim. P. 33(a), (b)(1). We apply a five-part test when analyzing Rule 33 motions. The party seeking a new trial must show:

> (1) the evidence is newly discovered; (2) the defendant was diligent in seeking the evidence; (3) the evidence is material to the issues at trial; (4) the evidence is not (a) cumulative or (b) merely impeaching; and (5) the evidence indicates the defendant *would* probably be acquitted in a new trial.

*Hinkson*, 585 F.3d at 1264 (emphasis added) (citing *United States v. Harrington*, 410 F.3d 598, 601 (9th Cir. 2005)).

B. **Challenges to Courtland Gettel's Testimony**

Defendants invoke *Napue*, *Brady*, and Rule 33 to challenge the testimony of government witness Courtland Gettel. Defendants argue that: Courtland Gettel lied about the death of his son to invoke sympathy; the government failed to disclose an FBI spreadsheet reflecting Gettel's bank transactions, and Gettel lied about the transactions; Gettel falsely testified that defendants caused his drug relapse and he suffered multiple opiate-related overdoses and hospitalizations as a result; the government failed to disclose a report of an FBI interview with Gettel's business and criminal partner; the government withheld evidence that would have allowed the defense to argue that Gettel agreed to testify because the government

4

threatened to arrest Gettel's wife; and the Government learned, the day the jury returned its verdict, that Gettel had continued to engage in fraudulent activity and to use drugs while he was cooperating with the government and testifying as a government witness.

All these arguments fail because the government presented overwhelming evidence of defendants' guilt, and none of these purported constitutional violations or additional evidence could or would have changed the outcome of defendants' trial. In short, Gettel's testimony was unnecessary to secure defendants' convictions.[1] The evidence showed, among other things, that: Berry coordinated drug transactions with an informant and stated that he intended to open a "clinic" to distribute more drugs; defendants' fingerprints were found in parcels with oxycodone pills; packages of cash were sent to (and seized from) defendants' private mailboxes; defendants' pharmacy dealt almost exclusively in the highest dosages of opioids and controlled substances desirable on the black market; defendants used the same stolen identities—those of their college classmates—to obtain phony prescriptions before they opened their pharmacy and to create phony

---

[1]     The government also introduced into evidence text messages that directly corroborated Gettel's statements that he purchased drugs from the Kabovs. Defendants object that the government introduced these messages through Gettel, but the messages were extracted directly from defendants' cell phones and the government proffered that its agents could authenticate the messages. As such, the government could have introduced the messages as statements of a party opponent.

prescriptions at their pharmacy; text messages showed that defendants actively coordinated with a single physician who prescribed about 99 percent of the Kabovs' pharmacy's prescriptions; prescriptions received by the pharmacy suddenly changed to call for compounded pills when defendants stopped ordering pre-manufactured pills wholesale; and discrepancies in defendants' reporting to the California Department of Justice revealed that over 100,000 pills were unaccounted for.

Because the Kabovs cannot satisfy the materiality standards under *Napue*, *Brady*, or Rule 33 with regard to Gettel's testimony, their challenges to Gettel's testimony fail.

## C. Other *Napue* Challenges

Defendants argue that the government violated *Napue* by presenting other false testimony at trial. We are not persuaded.

We reject defendants' argument that the government presented false evidence about three commercial mailboxes. First, defendants failed to show that Postal Inspector Daniel Johnson testified falsely when he stated that Dalibor was the "named renter" and "box holder" for mailbox 369. That Dalibor was assigned mailbox 487 on the same day he signed the lease for mailbox 369 does not establish that he was not also the renter of mailbox 369; indeed, the government's theory at trial was that defendants used multiple mailboxes to facilitate their drug-

6

distribution operations.  Defendants also rely on Dalibor's declaration and the absence of additional evidence showing that he extended his initial rental period for mailbox 369.  Dalibor did not testify at trial, so he was not available for cross-examination.  At most, defendants show that Johnson's testimony was disputed or rebuttable, which is not enough to show that the government presented false evidence.  *See Henry*, 720 F.3d at 1084.

Defendants argue that Johnson also falsely testified that defendants were connected to mailbox 409 when Johnson knew that other individuals began renting that mailbox in June 2012.  This *Napue* claim fails because Inspector Johnson testified that he intercepted and seized two packages addressed to "D. Kabov" or "Dabo Kabov" at mailbox 409 in December 2011 and January 2012, several months before business records show that others applied to rent the mailbox.

Defendants also attack Johnson's testimony that the Postal Service did not track money sent to mailbox 511 because the Postal Service "knew who the box was rented to."  Defendants argue that this testimony falsely implied they rented mailbox 511 when in fact business records showed that Obaidulah Ahmadi rented mailbox 511.  Johnson's statement was not misleading, and could not have affected the outcome of the trial, because the jury heard evidence that the intercepted parcels addressed to mailbox 511 were specifically addressed to Ahmadi and the government's theory at trial was that Ahmadi was a co-participant in defendants'

7

criminal activity.[2]

Defendants next argue the government's fingerprint expert falsely testified about when she first compared defendants' fingerprints to latent fingerprints found on the government's evidence. The expert testified that several of the latent prints matched Dalibor's fingerprints. In response to defense counsel's suggestion on cross-examination that the expert found "no matches" when she first lifted the latent prints in January 2014, the expert responded that "[t]here was no comparison done" at that time. In defendants' telling, the expert's statement was false because she ran the latent fingerprints through an FBI fingerprint database in January 2014, the database contains fingerprints of naturalized citizens, and the Kabovs submitted fingerprints when they were naturalized. Defendants also cite a notation in the expert's report stating that she compared the fingerprints from the evidence to Berry's fingerprints in a "U.S. Citizenship and Immigration [Services]" document. Based on this testimony, defendants speculate that the expert falsely testified about the date of the fingerprint comparison.

---

[2] Defendants also argue that Buntrock falsely testified that "defendants regularly listed" the commercial mail receiving agencies mailboxes as their addresses. The Kabovs do not develop this argument further. Given that a reasonable jury could conclude that the boxes belonged or were connected to the Kabovs, we are not persuaded that Buntrock's statement was false, misleading, or material.

Defendants have not met their burden to show that the expert's testimony was false or misleading. In context, this witness's testimony and her report made clear that she did not conduct a direct comparison between the latent prints and *Dalibor's fingerprint card* because "there was no fingerprint card . . . submitted with the evidence." Defendants fail to show that the expert knew the Kabovs' fingerprints were in the FBI database or that their fingerprints are in fact in the database. *See Henry*, 720 F.3d at 1084.

The government introduced a series of voice recordings from May and June 2012 between Berry and Greg Kneice, another participant in defendants' criminal activity. During cross-examination, the defense asked Johnson whether one of the telephone numbers used in the conversations was, in Johnson's "opinion," "somehow connected to [Berry] Kabov." Johnson answered, "That's correct." Defendants argue that this testimony was false and misleading because the government had subpoenaed telephone account information showing that the number's subscriber was someone else (not Berry). This *Napue* claim fails because the government is under "no obligation to correct [a witness's] qualified testimony about her own reasonably held belief, because it was not actually false." *Hayes v. Ayers*, 632 F.3d 500, 520 (9th Cir. 2011). Johnson's opinion was reasonable given that he was familiar with Berry's voice on the recordings, the participants on the calls discussed the Kabovs' pharmacy and government cash

9

seizures, and the government presented evidence tying Berry to the location identified by the speaker on the recording.

Defendants also argue that Johnson falsely claimed the first recorded telephone call between Kneice and Berry occurred on May 29, 2012, because digital data from Johnson's computer shows that he downloaded the calls a week before he claimed the calls occurred, and defendants' voice recognition expert concluded Berry was not one of the speakers on the call. These arguments are without merit because defendants fail to show that Johnson's testimony is actually false and not merely inaccurate or rebuttable. *See Henry*, 720 F.3d at 1084. Johnson testified about his process of transcribing the call logs, labeling the recordings, observing the first telephone call, and verifying the date by using Kneice's telephone. Johnson recognized Berry's voice, the jury was able to make its own voice comparison at trial, and circumstantial evidence that Berry was in Laguna Beach the same day the call was placed from that location further corroborated Johnson's statement. This evidence is equally consistent with the metadata being incorrect.

We conclude that defendants' *Napue* challenges fail individually and collectively because defendants failed to establish that much of the evidence they challenge was "actually false" or misleading, and there is not a reasonable

probability that absent the remaining evidence, the result at trial could have been different.

## II. Recorded Calls

Defendants challenge the district court's decision to admit Kneice's out-of-court statements made during recorded calls connected to the conspiracy. These challenges are without merit.

Defendants first argue that admitting Kneice's statements violated their confrontation rights because they lacked an opportunity to cross-examine him. We review de novo Confrontation Clause challenges. *United States v. Barragan*, 871 F.3d 689, 705 (9th Cir. 2017). The Confrontation Clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." *Id.* (quoting *Crawford v. Washington*, 541 U.S. 36, 59 n.9 (2004)). The district court admitted Kneice's statements on the recorded telephone calls only to give context to Berry's statements on the calls, and the court instructed the jury that it could not consider Kneice's statements for any other reason. Under our precedent, the admission of Kneice's statements for this purpose did not violate the Confrontation Clause. *See id.* at 704–05.

Defendants also argue that Johnson's opinion that Berry was one of the speakers on the recorded calls was based solely on Kneice's out-of-court statements. This argument fails because Johnson testified that he instructed Kneice

to call Berry and personally observed that call, and Johnson had personal knowledge that allowed him to recognize Berry's voice.[3]

Defendants next argue that the district court abused its discretion by admitting the voice recordings and Johnson's call log because they were not properly authenticated. We review for an abuse of discretion the district court's authentication decisions and decisions to admit lay opinion testimony. *United States v. Estrada-Eliverio*, 583 F.3d 669, 672 (9th Cir. 2009); *United States v. Ortiz*, 776 F.3d 1042, 1044 (9th Cir. 2015). The district court did not abuse its discretion because a reasonable jury could find that the recordings and log were what the government claimed that they were. *See* Fed. R. Evid. 901(a); *United States v. Gadson*, 763 F.3d 1189, 1203–04 (9th Cir. 2014). For audio recordings, a witness who testifies that he recognizes a voice on a recording, or provision of other extrinsic evidence, may be sufficient for authentication. *See Gadson*, 763 F.3d at 1204. Johnson testified about Kneice's cooperation and his supervision of Kneice, how the calls were recorded and stored, and how he created the log. Johnson also confirmed that the recordings were accurate copies of the calls he

---

[3]     Defendants also challenge Kneice's statements that the government elicited during a hearing outside the presence of the jury, at which the district court considered whether to admit the call log and recordings. These confrontation challenges fail because even assuming there was a Confrontation Clause violation, any error was harmless beyond a reasonable doubt given the other evidence in the record that authenticated the calls and overwhelmingly established defendants' guilt.

12

recorded. The content of the calls further reinforced the calls' authenticity and that Berry was one of the speakers. Additionally, Drug Enforcement Administration (DEA) Investigator Kevin Buntrock testified to the jury that he was familiar with Berry's voice and recognized it in the recordings. Defendants' arguments focus on discrepancies in the recordings and Johnson's call log, but these arguments regarding accuracy and chain of custody are relevant only to the evidence's probative value, not its admissibility. *See id.* at 1204.

Last, defendants argue that the district court violated their due process rights by admitting the recordings and letting Johnson testify about them because he deleted the original recordings from his computer. This claim is forfeited because defendants did not raise it in a motion to suppress before trial, and the district court never addressed it. *See United States v. Murillo*, 288 F.3d 1126, 1135 (9th Cir. 2002); *Ahanchian v. Xenon Pictures, Inc.*, 624 F.3d 1253, 1260 n.8 (9th Cir. 2010). Motions to suppress must be made before trial "if the basis for the motion is then reasonably available" and the motion "can be determined without a trial on the merits." Fed. R. Crim. P. 12(b)(3)(C). Motions that do not meet this deadline are untimely and may be considered only if the movant shows "good cause." Fed. R. Crim. P. 12(c). Defendants' good cause arguments—which they raise for the first time in their reply brief on appeal—do not withstand scrutiny because the record demonstrates the defense knew that Johnson had deleted the original recordings

13

before he testified, and defense counsel highlighted the significance of that fact in his opening statement.

### III. Challenged Jury Instructions

Defendants challenge the district court's jury instructions regarding the drug distribution and importation counts. We address each in turn.

Defendants do not dispute that they invited instructional error by proposing the distribution jury instructions they now challenge on appeal.[4] *See United States v. Perez*, 116 F.3d 840, 844 (9th Cir. 1997) (en banc) (explaining that "the defendant himself propos[ing] allegedly flawed jury instructions" is a prototypical example of inducing or causing error); *United States v. Myers*, 804 F.3d 1246, 1254 (9th Cir. 2015) (explaining that when a defendant has invited the error and relinquished a known right, the alleged error is considered "waived and therefore unreviewable" (quoting *Perez*, 116 F.3d at 845)). The record reflects that defendants relinquished a known right because the arguments they raise on appeal concerning the distribution instructions are functionally the same arguments they made to the district court to support their proposed instruction. Defendants' challenges to these instructions fail.

---

[4] The district court instructed the jury that the government needed to prove beyond a reasonable doubt that "the defendant acted with the intent to distribute the identified controlled substance outside the usual course of professional practice and without legitimate medical purpose."

Defendants were separately charged with and convicted of several counts of unlawfully importing controlled substances (Counts 5 through 8). Defendants argue that the district court failed to properly instruct the jury on the defense's theory for these counts, which was that defendants imported steroids for legitimate use and believed that their importation was lawful because their pharmacy was registered with the DEA. In support of their requested instruction, defendants presented evidence that they told their Chinese supplier to report the imported drugs to American customs officials. Defendants argued to the district court that their requested instruction required the jury to find defendants "knew that the importation was unlawful either as a result of intentional failure to obtain an import license or because it was obtained while acting and intending to act outside the usual course of professional practice and without a legitimate medical purpose." Defendants also argued to the district court that knowledge that their importation was unlawful was an element of the importation offense. The government argues that defendants' instruction was not legally required because defendants did not provide evidence that they had a valid importation license. The district court declined to give defendants' requested instruction.[5]

---

[5]   The district court instructed the jury that to meet its burden of proof on the importation counts, the government needed to prove:
(cont.)

The district court did not have the benefit of the Supreme Court's decisions in *Rehaif v. United States*, 139 S. Ct. 2191 (2019) and *Ruan v. United States*, 142 S. Ct. 2370 (2022), which bear on the questions presented here. We take no position on the parties' arguments, but rather vacate defendants' convictions on the importation counts and remand for the district court to apply *Rehaif* and *Ruan* in the first instance, decide whether the jury was properly instructed in light of those decisions, and for any further proceedings that may be required.

## IV. Challenges to Dang's Expert Testimony

The government called Dr. Janice Dang of the California State Board of Pharmacy to testify as an expert witness about the usual course of professional pharmacy practice and whether defendants' actions comported with the ordinary standards imposed on pharmacies by state regulatory law. Over defense objection, the district court permitted Dr. Dang to testify as an expert witness and to testify about how legitimate pharmacies operate. We review for an abuse of discretion

---

First, the defendant knowingly brought or caused to be brought the controlled substance named in the respective counts of the indictment into the United States from a place outside the United States.

And second, the defendant knew the substance was the controlled substance named in the respective count of the indictment or some other prohibited drug.

The conspiracy instructions mirrored these instructions.

16

the district court's decision to admit expert testimony. *United States v. Feingold*, 454 F.3d 1001, 1006 (9th Cir. 2006).

Defendants first argue that the district court failed to act as a "gatekeeper" under Federal Rule of Evidence 702 because the court did not explicitly determine whether Dr. Dang's testimony was reliable. *See United States v. Valencia-Lopez*, 971 F.3d 891, 898 (9th Cir. 2020) (explaining that a district court abuses its discretion by admitting expert testimony without making any reliability findings). This argument is without merit. Pretrial, defendants argued that Dr. Dang's testimony should be excluded on *Daubert* grounds because the government failed to show that she "applied reliable principles and methods to arrive at her conclusions," or that her "opinions have any acceptance." The district court explicitly rejected these arguments because Dr. Dang's testimony was based on "her knowledge and experience," not "scientific or technical analysis." The record showed that Dr. Dang had worked for the Board of Pharmacy for seventeen years as an investigator. The district court cited our decision in *Hangarter v. Provident Life and Accident Insurance Co.*, 373 F.3d 998 (9th Cir. 2004), which describes the applicable reliability inquiry when an expert provides non-scientific testimony. *Id.* at 1017–18. The court concluded that Dr. Dang "had a great deal of experience inspecting and supervising the inspection of pharmacies to ensure compliance with governing laws and regulations." The court fulfilled its gatekeeping function.

Defendants next argue that Dr. Dang's testimony was not relevant or helpful to the jury and instead injected a lower civil standard of proof into the jury's determination. Defendants' argument cannot be reconciled with our holding and analysis in *Feingold*, where we concluded that expert testimony about the applicable standard of care for medical professionals prescribing medicines used for pain control was relevant and admissible in a prosecution for unlawful distribution. 454 F.3d at 1007. Expert testimony about accepted pharmaceutical practices was helpful for the jury to determine whether defendants were operating as a legitimate pharmacy, or unlawfully distributing controlled substances. *Id.* As explained, defendants waived any objection that the district court did not correctly instruct the jury about the proper standard for criminal liability for drug distribution.[6] *See supra*.

Defendants also argue that Dr. Dang's testimony was unduly prejudicial because they were only pharmacy owners, not licensed pharmacists. We hold that the district court did not abuse its discretion by concluding that the probative value of Dr. Dang's testimony was not substantially outweighed by the danger of undue

---

[6] For the same reasons, we reject defendants' contention that the government's closing argument improperly relied on the standard for civil infractions to establish criminal liability. The district court instructed the jury, consistent with *Feingold*, that the government was required to prove the distribution was *both* (1) "outside the course of professional practice," which is the standard of pharmaceutical practice "generally recognized and accepted in the country"; and (2) "without a legitimate medical purpose."

prejudice. *See* Fed. R. Evid. 403. The primary factual issue at trial was whether the Kabovs used their pharmacy to engage in unlawful drug distribution. Testimony that the pharmacy operated far outside of accepted pharmaceutical practices was directly relevant to proving the government's theory that defendants' distributions were without authorization. The district court did not abuse its discretion by admitting Dr. Dang's testimony.

### V. Evidentiary Objections

We are not persuaded by defendants' remaining evidentiary objections. Defendants argue that two government witnesses—Internal Revenue Service Special Agent Carlos Tropea and DEA Investigator Buntrock—offered a mix of lay and expert opinion testimony and that the district court failed to give an appropriate "dual role" instruction. *See United States v. Vera*, 770 F.3d 1232, 1246 (9th Cir. 2014). Neither Tropea nor Buntrock provided dual-role testimony, so the instruction was not warranted for either witness. The government called Tropea as an expert witness. His conclusions that defendants' financial records were inconsistent with their receipt of cash gifts from their mother, and that any glitches in defendants' pill reporting system would not affect his analysis, constituted expert testimony because these opinions were based on his specialized knowledge and training. *See* Fed. R. Evid. 702, 703. Conversely, Buntrock provided only lay witness testimony based on his involvement in this investigation.

19

We have long permitted case agents to provide lay opinions based on their knowledge of an investigation. *See, e.g., Gadson*, 763 F.3d at 1206–07; *United States v. Freeman*, 498 F.3d 893, 904–05 (9th Cir. 2007); *Ortiz*, 776 F.3d at 1045 (voice identification is lay opinion).

Defendants also contend that Buntrock improperly bolstered Gettel's testimony. We disagree. Buntrock testified about facts that were consistent with Gettel's testimony, but this does not constitute improper bolstering. *Cf. United States v. Preston*, 873 F.3d 829, 845–46 (9th Cir. 2017). Buntrock also testified there was no publicly available information that may have indicated to Gettel that defendants were being investigated for identity theft. The district court permitted this questioning "as to [Buntrock's] knowledge." It did not call for an impermissible opinion on the veracity of Gettel's testimony that defendants were involved in identity theft.

Defendants argue that the government improperly presented evidence about their unlawful distribution of Adderall because the indictment charged them only with unlawful distribution of opioids. The district court did not abuse its discretion admitting this evidence. *See United States v. Nelson*, 137 F.3d 1094, 1106–07 (9th Cir. 1998). Defendants not only failed to object to significant portions of the Adderall-related testimony, defendants themselves elicited additional testimony about Adderall. The evidence was relevant because it corroborated testimony

20

about how defendants used their pharmacy to provide drugs without prescriptions and it was further proof that the defendants knew their activities were unlawful. *See* Fed. R. Evid. 404(b); *see Nelson*, 137 F.3d at 1107 (explaining factors that the court must consider when admitting other similar act evidence). The district court did not abuse its discretion by concluding that the risk of undue prejudice did not substantially outweigh the probative value of the evidence because the jury already heard substantial evidence of defendants' other illicit drug-related activity. *See United States v. Le May*, 260 F.3d 1018, 1030 (9th Cir. 2001). Finally, the district court specifically instructed the jury about which drugs were at issue in the case and charged in the indictment, and the court provided the indictment to the jurors during their deliberations to avoid confusion. *See Nelson*, 137 F.3d at 1107.

Defendants next contend that the government used Agent Tropea's testimony to present inadmissible evidence to the jury about whether defendants' mother had gifted thousands of dollars to them and whether she prepared false statements to bolster the defense. This argument fails because defendants "open[ed] the door to this testimony" by raising it for the first time on cross-examination. *United States v. Hegwood*, 977 F.2d 492, 496 (9th Cir. 1992). The district court admitted this testimony only to show its effect on Tropea's investigation, and the court instructed the jury accordingly. Defendants identify nothing in the record to suggest that the government lacked a "good faith basis" for

21

asking these questions. *United States v. Rushton*, 963 F.2d 272, 274–75 (9th Cir. 1992).

Defendants also challenge the government's statement in closing argument that "[t]here is a whole other can of worms of compounded creams and insurance companies that is not at issue in this case." Defendants did not contemporaneously object to this argument, which directly responded to the testimony of one of the defense witnesses, who suggested that defendants' pharmacy dealt primarily in cash because "90 percent of insurance companies [would] not cover" the pharmacy's compounded creams. Defendants cannot show plain error because the government's argument did not "plainly" encourage the jury to convict based on other uncharged wrongful acts or evidence not in the record, nor can defendants show that any error "seriously affect[ed] the fairness, integrity, or public reputation of [the] judicial proceedings." *United States v. Cotton*, 535 U.S. 625, 631 (2002). The government directed the jury's focus to the opioid evidence in response to defendants' witnesses, argued that only "[t]he pills are at issue in this case," and reminded the jury that the government's witnesses testified that "insurance companies *do* cover Oxycodone pills." (emphasis added).

Last, defendants argue that their due process rights were violated because they were prevented from introducing evidence supporting their theory that gaps in their pharmacy's reporting were caused by glitches in the pharmacy's software,

and the district court wrongfully excluded a letter from the software company's CEO on hearsay grounds. Defendants do not dispute that the letter was hearsay, but they argue that the court's decision to exclude it deprived them of evidence that was crucial to their defense. To succeed on their due process claim, defendants must show that the evidence was "sufficiently reliable and crucial to the defense." *United States v. Hayat*, 710 F.3d 875, 898 (9th Cir. 2013) (quoting *United States v. Lopez-Alvarez*, 970 F.2d 583, 588 (9th Cir. 1992)). To determine whether an excluded statement is sufficiently "reliable," we consider whether the excluded statement was spontaneous, corroborated, made against interest, or if it contained other "persuasive assurances of trustworthiness." *Id.* at 899 (citation omitted). Defendants have not attempted to show that the CEO's letter was reliable. The letter was not spontaneous, the state inspector testified she was unable to corroborate the letter's contents by speaking to the CEO directly, and the letter opined on defendants' mental state. On this record, the district court's decision to exclude the letter did not violate defendants' due process rights.

We vacate defendants' convictions on Counts 5 through 8 and remand those counts for proceedings consistent with this memorandum disposition. We affirm in all other respects. Each side shall bear its own costs on appeal.

**AFFIRMED IN PART, VACATED IN PART, REMANDED.**