**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, *Plaintiff-Appellee*, v. OSCAR RODRIGUEZ, AKA Lonely, *Defendant-Appellant*. | No. 08-50479 D.C. No. 5:05-cr-00069-VAP-3 |

| | |
|---|---|
| UNITED STATES OF AMERICA, *Plaintiff-Appellee*, v. JOSE MURILLO, AKA Yogi, *Defendant-Appellant*. | No. 08-50483 D.C. No. 5:05-cr-00069-VAP-2 |

| | |
|---|---|
| UNITED STATES OF AMERICA, *Plaintiff-Appellee*, v. ALEJANDRO MUJICA, AKA Slow, *Defendant-Appellant*. | No. 08-50485 D.C. No. 5:05-cr-00069-VAP-4 |

| | |
|---|---|
| UNITED STATES OF AMERICA, *Plaintiff-Appellee*, v. OSCAR RODRIGUEZ, AKA Lonely, *Defendant-Appellant*. | No. 12-50121 D.C. No. 5:05-cr-00069-VAP-3 |

| | |
|---|---|
| UNITED STATES OF AMERICA, *Plaintiff-Appellee*, v. JOSE MURILLO, AKA Yogi, *Defendant-Appellant*. | No. 12-50132 D.C. No. 5:05-cr-00069-VAP-2 OPINION |

Appeal from the United States District Court
for the Central District of California
Virginia A. Phillips, District Judge, Presiding

Argued and Submitted
August 28, 2013—Pasadena, California

Filed June 19, 2014

Before: Ronald M. Gould and Johnnie B. Rawlinson,
Circuit Judges, and Ivan L.R. Lemelle, District Judge.[*]

Opinion by Judge Rawlinson

---

[*] The Honorable Ivan L.R. Lemelle, U.S. District Judge for the Eastern District of Louisiana, sitting by designation.

## SUMMARY[**]

### Criminal Law

The panel affirmed three defendants' convictions for conspiracy to commit murder and first degree murder stemming from the stabbing of a prison inmate, Peter Scopazzi.

The panel held that the district court's exclusion of evidence concerning medical negligence and Scopazzi's removal of his breathing tube does not warrant reversal of the convictions, where the defendants failed to demonstrate that any medical negligence related to Scopazzi's multiple stab wounds and his removal of his breathing tube were the sole causes of his death or were so extraordinary and unforeseeable as to absolve the defendants of liability for their vicious assault.

The panel held that the district court did not abuse its discretion in admitting evidence of the defendants' connections to the Mexican Mafia to demonstrate their motive for murdering Scopazzi. The panel also held that expert testimony concerning the connections between the Sureños and the Mexican Mafia within the prison gang hierarchy and photographs of the defendants with Mexican Mafia members did not render their trial unfair because the district court properly minimized any prejudice stemming from the evidence and the trial was replete with admissible evidence regarding the defendants' gang affiliations.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel held that the defendants failed to demonstrate under *Brady*, *Mooney*, or *Napue* that a new trial was warranted based on the government's failure to disclose immaterial information regarding a government witness' sentence reduction and his cooperation in a DEA investigation.

---

**COUNSEL**

Verna Wefald (argued), Pasadena, California, for Defendant-Appellant Oscar Rodriguez.

Michael J. Treman, Santa Barbara, California, for Defendant-Appellant Jose Murillo.

Ethan A. Balogh (argued) and Jay A. Nelson, Coleman & Balogh LLP, San Francisco, California, for Defendant-Appellant Alejandro Mujica.

André Birotte, Jr., United States Attorney, Robert E. Dugdale, Chief Assistant United States Attorney, Antoine F. Raphael (argued), Assistant United States Attorney, Riverside, California, for Plaintiff-Appellee United States.

---

**OPINION**

RAWLINSON, Circuit Judge:

Appellants Oscar Rodriguez (Rodriguez), Jose Murillo (Murillo), and Alejandro Mujica (Mujica) challenge their convictions for conspiracy to commit murder and first degree murder stemming from the stabbing of a prison inmate, Peter

Scopazzi (Scopazzi) at the United States Penitentiary at Victorville, California. Appellants contend that the district court abused its discretion in excluding evidence that medical negligence and Scopazzi's removal of his breathing tube during his hospitalization may have been the proximate cause of Scopazzi's death. Appellants also argue that the district court abused its discretion in admitting expert testimony concerning the relationship between two prison gangs—the Sureños and the Mexican Mafia—because Appellants were not members of the Mexican Mafia.

Additionally, Appellants maintain that a new trial was warranted because the government failed to disclose, as required by *Brady v. Maryland*, 373 U.S. 83 (1963) and *Giglio v. United States*, 405 U.S. 150 (1972), a tacit agreement with a key government witness that the government would seek a sentence reduction in exchange for the witness's favorable testimony, and that the witness was an informant for the Drug Enforcement Administration (DEA). Appellants further assert that the government violated *Mooney v. Holohan*, 294 U.S. 103 (1935) and *Napue v. Illinois*, 360 U.S. 264 (1959), by allowing the witness to falsely testify that there was no promise of a sentence reduction based on the witness's cooperation. We affirm Appellants' convictions and the district court's denial of their motion for a new trial.

## I. BACKGROUND

In a second superseding indictment, Appellants, along with Danny Martinez (Martinez) and Walter Meneses (Meneses), were charged with "knowingly and willfully conspir[ing] and agree[ing] with each other to murder inmate David Fischer . . . aka Peter Scopazzi" in violation of

18 U.S.C. § 1111. The indictment alleged that Appellants armed themselves with prison-made knives (shanks) and murdered Scopazzi in his cell. Appellants were charged with "willfully, deliberately, and with premeditation and malice aforethought, unlawfully kill[ing] [Scopazzi]." Appellants were also charged with assaulting two other prison inmates, Timothy Ultsch (Ultsch) and Wayne Rondeau (Rondeau), with the intent to commit murder, and assault with a deadly weapon "with the intent to do bodily harm."

Prior to trial, the government filed a motion *in limine* to exclude evidence that medical negligence may have contributed to Scopazzi's death. The government maintained that Appellants "proffered no witness, expert or otherwise, nor any other evidence to the government that would indicate that [Scopazzi's] treatment by medical staff was somehow negligent. . . ." The government also asserted that such evidence was irrelevant because Appellants were liable for murder irrespective of any medical negligence and that the evidence might lead to juror confusion.

The government also filed a related motion *in limine* to preclude or limit the testimony of the defense's medical expert, Dr. Marshall Morgan, concerning medical negligence.[1] The government asserted that the defense's

---

[1] In a letter to the prosecution, Murillo's attorney stated that the defense intended to call Dr. Morgan to "testify about the nature of the stab wounds suffered by [Scopazzi] . . . and the medical care given to [Scopazzi] by prison and hospital personnel to treat those injuries." "He will state that in his opinion [Scopazzi's] stab wounds could have been successfully treated surgically. Furthermore, if [Scopazzi's] condition had been properly evaluated, the need for immediate surgery should have been obvious." "But because the nature of [Scopazzi's] injuries was not promptly or competently assessed and appropriately treated, the medical

notice did "not indicate that Dr. Morgan will state that [Scopazzi's] death was caused solely by the independent intervening acts of the medical staff's treatment. That [Scopazzi's] life may have been saved by more skillful medical treatment, even if true, is legally irrelevant . . . because even if this were true it would not relieve defendants of responsibility for [Scopazzi's] murder. . . ."

In his oppositions to the government's motions, Murillo responded that he did "not intend to introduce evidence of negligence as an affirmative defense to murder. . . ." Murillo maintained that the evidence of medical negligence and Dr. Morgan's testimony "would further explain that the injuries caused by the stab wounds would have been routinely repaired with proper medical care. The nature of [Scopazzi's] wounds and degree of force used to cause them may be circumstantial evidence of whether or not there was intent to kill. . . ."

In granting the government's motions, the district court held that medical negligence was not a defense to murder charges. The district court excluded Dr. Morgan's testimony because Murillo failed "to proffer expert testimony that [Scopazzi's] death was caused solely by the independent intervening acts of the medical staff's treatment. . . ." The district court held that "Dr. Morgan shall be allowed to testify regarding the nature of [Scopazzi's] wounds and the degree of force used to cause them as such testimony is relevant to the intent of the Defendants. . . ." However, Dr. Morgan was precluded from testifying "about medical negligence in this

---

attention he did receive fell well below well-recognized standards of care resulting in [Scopazzi's] death."

case as the probative value of such evidence outweighs the danger of confusing the jury."**2**

In its trial memorandum, the government sought to introduce evidence that the motive for Appellants' murder of Scopazzi was Scopazzi's disrespect of Sureños gang members. The district court held that evidence of Appellants' Sureños membership and the Sureños' relationship with the Mexican Mafia was admissible as relevant to the government's theory that Appellants assaulted Scopazzi due to their Mexican Mafia connections. The district court held that the gang affiliation evidence was more probative than prejudicial and that the government was permitted to introduce "a limited number of photographs of [Appellants] posing with certain members of the Mexican Mafia, as such evidence may go to issues of planning and preparation of the alleged offenses, and the level of retribution called for under the tenets of the Sureños. . . ." Appellants declined the district court's offer to provide a limiting instruction concerning evidence related to the Mexican Mafia.

At trial, Ryan Davis (Davis), a former Victorville inmate imprisoned for being a felon in possession of a firearm and an armed career criminal, testified that he had prior convictions for burglary, providing false information to a police officer, attempting to [elude] a police officer and reckless driving, unlawful delivery of a controlled substance, and criminal mischief. While in prison, Davis "used marijuana, meth and heroin and drank," and was involved in an attack on another inmate.

---

**2** The judge apparently meant to say that the probative value of the evidence was outweighed by the danger of confusing the jury.

According to Davis, he was not a gang member, but was affiliated with the Aryan Brotherhood and Nazi Low Riders and had several tattoos including swastikas and the phrase "white power" on his chest. Despite his lack of gang membership, Davis was "handed the keys for unit 4A," a prison housing unit. Davis was given this leadership position by a member of the Aryan Brotherhood. Davis related that he became the unit's key holder because there were no gang members in the unit capable of the position.

According to Davis, Rodriguez belonged to the Sureños and answered to the Mexican Mafia. Davis related that the Sureños and the white inmates generally got along well and "called each other comrades." Davis got along well with Rodriguez and the other Sureños. Davis testified that inmates would have to receive permission to assault members of another race "from the top person for their race on the yard." Otherwise, "their race would stab them in return."

On April 11, 2005, Davis noticed that Scopazzi, Ultsch, and Rondeau had been drinking. Davis observed that Scopazzi was still drinking during dinner. Davis had injected methamphetamine on that day.

Later, Davis noticed Murillo, Rodriguez, and Mujica with another inmate, Dan Petty (Petty), in the prison yard.[3] According to Davis, Petty was escorting Murillo, Rodriguez, and Mujica through the yard so that they would not be stopped by the guards. Davis related that it was common practice for an inmate to escort other inmates who had

---

[3] During his testimony, Davis refers to Murillo, Rodriguez, and Mujica by their nicknames Yogi for Murillo, Lonely for Rodriguez, and Slow for Mujica. This opinion refers to Appellants by their last names.

weapons, alcohol, or drugs so as to create a diversion if stopped by the guards.

Davis subsequently met Scopazzi on the yard. Scopazzi "was drunk, kind of hyperactive. He was shadow boxing . . . with [Rondeau]." Murillo, Rodriguez, and Mujica "walked up while [Scopazzi] was horse playing" and looked irritated. Davis decided that he needed to "get [Scopazzi, Rondeau and Ultsch] to go to bed, to go to sleep so that . . . hopefully nothing would happen over in their side of the unit."

After Davis took Scopazzi and Ultsch to their cell, Robert Salazar (Salazar) visited the cell and inquired if there were any problems between Scopazzi and Murillo. Scopazzi joked that he and Murillo could "go in the TV room," meaning that Scopazzi and Murillo could fight. Davis told Salazar that Scopazzi was "acting up, but everything's all right . . ." Salazar responded, "all right guys" and "left the cell." Davis believed that Salazar "obviously was sizing stuff up." After Salazar left, Scopazzi told Davis that another inmate had Scopazzi's shank in the television room and Davis instructed Rondeau to retrieve the shank.

Murillo, Rodriguez, and Mujica entered Scopazzi's cell and closed the door behind them. Murillo went to the corner of the cell with his hands under his shirt. According to Davis, Murillo "had his teeth locked and his jaw clenched and his eyes were focused on [Scopazzi], and he just had a real angry look . . ." Davis told Murillo that Scopazzi had been drinking and pleaded with Murillo, "Don't do this." Murillo warned Davis to back up or he would "get stabbed, too." Davis noticed a piece of white sheet in Murillo's hand, which was "common with shanks. Davis also observed a bandana wrapped around Mujica's hand as Mujica moved towards

Scopazzi. As Davis grabbed Mujica and pulled him to the floor, Murillo stabbed Scopazzi. Rodriguez also had a shank and stabbed Rondeau in the face. Davis noticed that Rodriguez had gloves on his hands. When Ultsch returned to the cell, he was stabbed by Rodriguez. According to Davis, Scopazzi did not make any threatening moves or statements prior to the altercation. Davis testified that he never learned why Murillo, Rodriguez, and Mujica attacked Scopazzi.

After the altercation, Davis assisted Scopazzi, who had "puncture wounds in his chest." Although Scopazzi told Davis that he was all right, Davis was concerned about Scopazzi's breathing. Because Davis thought Scopazzi had a punctured lung, he assisted Scopazzi in seeking medical treatment. When Scopazzi continued to refuse medical treatment, prison guards placed him on the ground and shackled him.

Davis subsequently saw Salazar in the Special Housing Unit's recreation area, and Salazar told Davis to inform the FBI that Scopazzi had a knife. Davis eventually provided a statement to the FBI and was placed in protective custody. Davis acknowledged that termination of his sentence was possible based on his cooperation. Davis also conceded that he may have received a sentence reduction and been placed in a safer environment due to his cooperation. Davis acknowledged that he signed a letter agreement with the government requiring Davis to testify truthfully. According to Davis, the letter agreement did not contain any promises concerning a sentence reduction, and any leniency was not contingent upon the trial's outcome.

Regarding Davis' testimony, the district court instructed the jury that Davis "may have received, or may receive,

benefits from the government in connection with this case. For this reason, in evaluating the testimony . . . [the jury] should consider the extent to which or whether that witness's testimony may have been influenced by this factor. In addition, [the jury] should examine [Davis'] testimony with greater caution than that of other witnesses."

Dr. Glenn Holt, a medical examiner for San Bernardino County, performed the autopsy on Scopazzi. Dr. Holt observed that there were five puncture wounds on Scopazzi's body. The first puncture wound was approximately three inches deep and "went through the skin, soft tissue, and muscle and hit the third rib and caused some hemorrhage above and below the third rib and also in the muscle between the third and fourth ribs. . . ." The second puncture wound was "a little over three inches" deep and penetrated Scopazzi's right lung, causing the lung to collapse. The third puncture wound was approximately five inches deep and entered the peritoneal cavity creating a hole in the liver. The fourth puncture wound was approximately "two and a third inches" deep and penetrated the muscle wall into the peritoneal cavity. The fifth puncture wound was "a third of an inch" deep in Scopazzi's right upper arm.

Dr. Holt opined that the cause of Scopazzi's death was a "sequelae of puncture wounds of torso" and "the sequelae [were] events following an initial event, so . . . the injuries occur and during events subsequently there were complications that led to his death." Dr. Holt related that "there were some complications that flowed from the fact that

[Scopazzi] was stabbed" and that those complications led to his death.**[4]**

Officer Robert Riley, a Bureau of Prisons correctional officer, testified that he was working at the Special Housing Unit in April, 2005. On April 14, 2005, Officer Riley searched Murillo's cell and found a small note referred to as a "kite" in "a baby powder bottle." According to a stipulated translation of the kite, Murillo stated that Scopazzi had "disrespected the 'Sur,'" that Scopazzi and the other inmates "got what they had coming, cause [sic] I'm 100% Rider homeboy. . . ."

Special Agent Daniel Evanilla of the California Department of Corrections and Rehabilitation testified as an expert on prison gangs. According to Agent Evanilla, "Sureños are Hispanic gang members that, when they go to a prison or a county jail, band together as a group. . . ." Agent Evanilla related that "the Sureños are the recruitment pool for the Mexican Mafia," and "[t]hey are considered the foot soldiers for the Mexican Mafia." "The Sureños conduct criminal activities for the Mexican Mafia prison gang. They respond to . . . the edicts and the orders of the Mexican Mafia prison gang in terms of their criminal activities, their rules, their regulations and how they conduct themselves in prison." Agent Evanilla testified that respect from other prisoners was an important element of the Sureños' credo and disrespect was "not tolerated." Disrespect from a member of another race, particularly when witnessed by other Sureños, was "a major factor" in the Sureños' culture. According to Agent

---

**[4]** During cross-examination, the district court sustained objections to the defense's questions concerning the specific complications that led to Scopazzi's death and whether brain swelling was the major complication.

Evanilla, the reprisal for such disrespect would be "[s]ome violent assault." Agent Evanilla reviewed the kite that was discovered by prison officials in Murillo's cell and interpreted the kite as meaning that the white inmates had disrespected the Sureños.

Captain Robert Hodak of the Englewood Federal Correctional Institution also testified that the Sureños were "the foot soldiers for the Mexican Mafia." According to Captain Hodak, Salazar was an influential member of the Sureños and was considered a "[comrade] of the Mexican Mafia." Captain Hodak investigated the assault on Scopazzi. After reviewing the video of the inmates prior to the assault, Captain Hodak opined that, based on demeanor, positioning, and body language, Meneses and Martinez served as lookouts.

Salazar testified that he was serving sentences for armed bank robbery and possession of contraband. He confirmed that he was a Sureño, and that the Mexican Mafia controls the Sureños "to an extent." According to Salazar, the white inmates and the Sureños were "friendly" and "would hang out together."

On April 11, 2005, Salazar and Scopazzi started to drink wine together "right after breakfast . . . approximately 7 in the morning." Scopazzi became "overly drunk. He was loud. He was being physical with people . . . hitting on people. . . ." Salazar had never before observed Scopazzi in this condition.

Murillo told Salazar that Scopazzi "had disrespected [Murillo] in a sense where he was using the restroom on the toilet and [Scopazzi] opened the door and said something to the effect of, I could've got you, something like that."

Although Murillo and Scopazzi were friends, Murillo was "upset about what happened." Salazar went to Scopazzi's cell to talk to him. Salazar intended to tell Scopazzi that Scopazzi "was drunk, and that he was disrespecting people and he needed to go to sleep." Salazar asked Scopazzi "what's up with you and [Murillo]?" According to Salazar, Scopazzi jokingly said that he and Murillo could go to the television room and fight. Scopazzi eventually apologized. Salazar did not observe any shanks or other weapons in Scopazzi's cell.

After speaking with Scopazzi, Salazar informed Murillo that Scopazzi had apologized, and suggested that Murillo talk to Scopazzi the next day when Scopazzi was no longer intoxicated. However, Murillo "was upset over the disrespect and he felt that he had that apology coming from [Scopazzi] . . ." According to Salazar, he did not know that Scopazzi was going to be harmed and did not realize that Scopazzi had been stabbed until after the incident. Although he described himself as a mediator, Salazar acknowledged that he did not accompany Murillo to Scopazzi's cell.

After the assault on Scopazzi, Salazar observed a shank in Rodriguez's cell. Rodriguez did not tell Salazar that Scopazzi had attacked them. Salazar learned that Scopazzi had been stabbed from "the white guys on the tier."

Murillo testified that, while he was using the toilet in his cell, Scopazzi entered Murillo's cell and "put his hands on his waist" and said, "I could have got you slipping . . ." Murillo thought that Scopazzi "was playing around." Later in the day, Scopazzi entered Murillo's cell with Ultsch and Scopazzi "mov[ed] his body back and forth like he wanted to punch [Murillo] . . ." Murillo did not believe that "they were playing around anymore."

Murillo talked to Salazar because he "didn't want this to escalate into a bigger problem." Murillo told Salazar that "[t]hese guys keep coming to my cell and disrespecting me. . . ." Although Salazar told Murillo that Scopazzi had apologized, Murillo went to Scopazzi's cell for a direct apology. Murillo denied having a shank when he went to Scopazzi's cell. According to Murillo, Scopazzi started swearing at Murillo and reached for a shank. According to Murillo, he disarmed Scopazzi and used Scopazzi's shank to stab Scopazzi in self-defense.

Rodriguez testified that, when Rodriguez, Murillo, and Mujica went to Scopazzi's cell, they did not have any shanks. Scopazzi started to scream at them when they entered the cell and Rodriguez thought that Rondeau had a shank, although he never saw it. According to Rodriguez, he saw a shank tucked into Scopazzi's waistband.

James Reed Harris (Harris), an inmate at the Victorville federal prison who was serving sentences for bank robbery and "weapons, assault," testified that he was Davis' cellmate on the day of the assault. Davis had injected methamphetamine at least twice, had not slept for four days, and was "getting real paranoid." Harris described Davis as "acting rational enough," but Harris was concerned that Davis "might fall over . . ." Harris explained that he was "testifying because Ryan Davis [was] lying to get a time cut."

The jury convicted Murillo and Rodriguez of conspiracy to commit murder, first degree murder, and assault with a dangerous weapon with intent to do bodily harm as to Ultsch and Rondeau. The jury acquitted Murillo and Rodriguez of assault with intent to commit murder as to Ultsch and Rondeau.

The jury convicted Mujica of conspiracy to commit murder and first degree murder, but acquitted Mujica of assault with intent to commit murder and assault with a dangerous weapon with intent to do bodily harm as to Ultsch and Rondeau.

Appellants filed a motion for new trial because the government failed to disclose that Davis had received an undisclosed sentence reduction and had served as a DEA informant.[5]  Appellants maintained that Davis had a tacit agreement with the government for a sentence reduction because the government sought to reduce Davis' sentence on the same day as the verdicts were rendered.  The motion was denied.

Appellants filed timely notices of appeal.

## II.  STANDARDS OF REVIEW

"We review de novo whether an evidentiary error rises to the level of a constitutional violation. . . ." *United States v. Pineda-Doval*, 614 F.3d 1019, 1032 (9th Cir. 2010) (citation omitted).

"We review the district court's evidentiary rulings for abuse of discretion and its underlying factual determinations for clear error." *United States v. Lukashov*, 694 F.3d 1107, 1114 (9th Cir. 2012) (citation omitted).

"We review de novo a district court's denial of a new trial motion based on a *Brady* violation."  *United States v.*

---

[5] We granted a limited remand for the district court to consider Appellants' motion.

*Sedaghaty*, 728 F.3d 885, 899 (9th Cir. 2013) (citation omitted). "Likewise, the question of materiality is a legal matter that we review de novo." *Id.* (citations, alteration, and internal quotation marks omitted).

We also review *de novo* the district court's denial of a new trial based on an asserted *Mooney-Napue* violation. *See United States v. Houston*, 648 F.3d 806, 814 (9th Cir. 2011).

## III.   DISCUSSION

### A.  Medical Evidence Concerning Scopazzi's Death

Appellants contend that the district court denied them a complete defense by improperly excluding evidence that gross medical negligence and Scopazzi's removal of his breathing tube contributed to Scopazzi's death. Appellants maintain that the excluded medical evidence was relevant to Appellants' defense that the stab wounds were not the proximate cause of Scopazzi's death and that they lacked the requisite intent to kill Scopazzi.

The resolution of Appellants' evidentiary challenge is largely controlled by our decision in *Pineda-Doval*. In that case, Pineda-Doval challenged his convictions for "ten counts of transportation of illegal aliens resulting in death." *Pineda-Doval*, 614 F.3d at 1022. He maintained that "the jury should have been instructed that it could find the defendant guilty only if his conduct was the proximate cause of the ten charged deaths. . . ." *Id.* Pineda-Doval argued that the proximate cause of the aliens' death was the negligent deployment by Border Patrol agents of a spike strip that caused the defendant's vehicle to flip over. *See id.* at 1024. Prior to trial, the district court granted the government's

motion *in limine* to exclude as irrelevant evidence that the Border Patrol agents had failed to comply with the requisite procedures for deployment of the spike strip.  *See id.*

Pineda-Doval argued that the district court failed to properly instruct the jury that the "resulting in death" element required proof that his acts were the proximate cause of the aliens' deaths.  *Id.* at 1025.  We observed that "[a] basic tenet of criminal law is that, when a criminal statute requires that the defendant's conduct has resulted in an injury, the government must prove that the defendant's conduct was the legal or proximate cause of the resulting injury. . . ."  *Id.* at 1026 (citation and internal quotation marks omitted).  We explained that proof of proximate cause required a showing by the government that the harm suffered by the victim was a foreseeable outcome of the defendant's conduct.  *See id.* at 1028.  The proximate cause showing is more easily met when the intervening event is "not a coincidence or unrelated to the defendant's prior conduct, but rather was a response to that conduct."  *Id.*  When the intervening event is a response to the defendant's conduct, "the question is whether the intervening act was abnormal—that is, whether, looking at the matter with hindsight, it seems extraordinary. . . ."  *Id.* (citation omitted).  We held:

> Pineda-Doval's failed attempt to swerve around the spike strip was the proximate cause of the deaths of ten individuals.  It was entirely foreseeable that the Border Patrol would deploy a [spike strip] against the defendant's Suburban and that Pineda-Doval's dangerous driving would end in an accident. . . . No reasonable jury could have

found that a car accident was an extraordinary result.

*Id.* at 1029.

We rejected the defendant's argument that the Border Patrol agents' negligence "constituted a superseding cause of the accident. . . ." *Id.* at 1029. We opined:

If we assume that [the Border Patrol agent] made a mistake by pulling the [spike strip] across the road several seconds too early, this mistake was not so extraordinary as to break the chain of causation. Pineda-Doval created the dangerous conditions . . . and, because he refused to pull over in response to [the Border Patrol agent's] lights and sirens, forced the Border Patrol to use drastic measures to stop him. The resulting deaths of his ten passengers were tragic, but not unexpected. . . .

*Id.* at 1029–30.

We held that any error in the district court's exclusion of evidence that the Border Patrol agents were negligent in failing to follow the requisite procedures for deployment of the spike strip was harmless. "[O]ccasional negligence that should have been anticipated by the defendant does not defeat proximate cause. . . ." *Id.* at 1029 (citation and internal quotation marks omitted). "To show that the actions of [the Border Patrol agent] constituted a superseding cause that broke the chain of causation between Pineda-Doval's dangerous driving, that negligence would have had to be so

extraordinary that it would be unfair to hold the defendant responsible for the resulting accident and deaths." *Id.* at 1034 (citation and internal quotation marks omitted). "Even assuming that the defendant persuaded the jury that timing was essential to the correct and safe deployment of [the spike strip] and that [the Border Patrol agent] made the mistake of pulling the spike strip across the road several seconds too early, no reasonable jury could have found that [the Border Patrol agent's] actions were extraordinary and could not have been foreseen by [the defendant]." *Id.* (citations and footnote reference omitted). Therefore, "[t]he district court's error in excluding evidence of [the Border Patrol] policies on spike strips was harmless beyond a reasonable doubt." *Id.*

Similarly, in this case we conclude that any error in the district court's exclusion of evidence concerning medical negligence or Scopazzi's removal of his breathing tube was harmless beyond a reasonable doubt. Because medical treatment was a foreseeable response to Appellants' conduct of stabbing Scopazzi, proximate cause was established by the government. *See id.* at 1028. Appellants failed to proffer evidence establishing medical negligence as a superseding cause of Scopazzi's death. To make the required showing, Appellants would have to demonstrate that medical negligence and Scopazzi's removal of his breathing tube were "so extraordinary that it would be unfair to hold [Appellants] responsible for the resulting . . . death[ ]." *Pineda-Doval*, 614 F.3d at 1034 (citation and internal quotation marks omitted); *see also Mitchell v. Prunty*, 107 F.3d 1337, 1341 n.8 (9th Cir. 1997), *as amended*, *overruled on other grounds by Santamaria v. Horsley*, 133 F.3d 1242, 1248 (9th Cir. 1998) (observing that "if gross maltreatment of the wound was the sole cause of death, the person inflicting the wound will not be liable, because the wound was not the proximate

cause of death. In this case, gross maltreatment would have been required to render [the victim's] gunshot wounds fatal.") (citation and internal quotation marks omitted).

As it was foreseeable in *Pineda-Doval* that Border Patrol agents would deploy a spike strip to stop a fleeing suspect, it was similarly foreseeable in this case that a victim of multiple deep stab wounds would receive medical care. *See Pineda-Doval*, 614 F.3d at 1034. And, as we held in *Pineda-Doval*, any negligence in the foreseeable response to the stab wounds does not break the causation chain. *See id.* The same is true regarding Scopazzi's removal of his breathing tube. *See Sedation and Delirium in the Intensive Care Unit*, 14 New England J. of Med. 444 (Jan. 30, 2014) (discussing the accidental removal of endotracheal tube due to delirium and agitation); *see also* Peter Pressman, M.D., *Delirium: An Acute Confusional State*, April 23, 2014 (observing that "[a]cute confusional state, also known as delirium or encephalopathy, is so common in hospitals that it's almost seen as routine by many hospital staff. Between 14 to 56% of all hospitalized patients develop confusion. Intubated patients in the intensive care unit have an even higher rate, reaching about 82%. . . . Such agitated patients may also try to remove tubes or IV lines that are providing life-saving medications.") (available at http://neurology.about.com/od/Delirium/a/Delirium.htm)(last visited May 8, 2014).

Dr. Morgan's proffered testimony did not address whether medical negligence was the sole cause of Scopazzi's death or even an intervening cause. Although Dr. Morgan purportedly opined that "the medical attention [Scopazzi] did receive fell well below well-recognized standards of care resulting in [Scopazzi's] death," Dr. Morgan did not state that extraordinary medical negligence or Scopazzi's removal of

his breathing tube caused Scopazzi's death independent of the stab wounds themselves. Although the district court ruled that Dr. Morgan could testify "regarding the nature of [Scopazzi's] wounds and the degree of force used to cause them," Dr. Morgan never actually testified. Appellants also informed the district court that they did not intend to rely on medical negligence as an affirmative defense. Thus, the district court's exclusion of Appellants' proffered evidence had no bearing on the fairness of Appellants' trial because that evidence did not establish medical negligence or removal of the breathing tube as a superseding cause of Scopazzi's death.

Our conclusion that Appellants failed to proffer admissible evidence that extraordinary medical negligence or Scopazzi's removal of his breathing tube constituted a supervening cause of Scopazzi's death is bolstered by the Seventh Circuit's rationale in *Brackett v. Peters*, 11 F.3d 78 (7th Cir. 1993). In *Brackett*, the habeas petitioner was convicted of felony murder based on his rape and assault of an 85-year-old woman. *See id.* at 79. The victim "was admitted to the hospital with a broken arm, a broken rib, and extensive bruises. During her stay in the hospital, which lasted several weeks, she—described as feisty before the rape and beating—became depressed, resisted efforts to feed her, and became progressively weaker." *Id.* (internal quotation marks omitted). After her transfer to a nursing home, she continued to regress, even though her physical injuries were healing. Because of her lack of appetite, her doctor ordered placement of a nasal gastric feeding tube. However, the tube could not be inserted, in part because the victim's facial injuries made insertion of the tube too painful. *See id.* Approximately ten days after her admission, the victim died when a large quantity of food became lodged in her trachea,

asphyxiating her. *See id.* The habeas petitioner contended that the negligence of the nurse who was feeding the victim caused her death. *See id.* at 80.

In rejecting the habeas petitioner's argument and holding that the petitioner's assault was the proximate cause of the victim's death, the Seventh Circuit observed that "an act is a cause of an event if two conditions are satisfied:  the event would not have occurred without the act; the act made the event more likely." *Id.* at 79. The Seventh Circuit opined that the nurse's purported negligence was nothing more than another cause of the victim's death. *See id.* at 80. The Seventh Circuit concluded that "a murderer does not avoid conviction by pointing out that his act was only one of many causes that concurred to bring about his victim's death." *Id.* "It is enough if his act was one of the causes-enough therefore if [the petitioner's] assault made [the victim's] death more likely and if, but for the assault, she would not have died as soon as she did. . . ." *Id.* (citations omitted). "Death was the last link in a continuous series of events that began with the assault.  [The victim] died a month later, never having returned home. . . ." *Id.* The court emphasized that had the victim never been assaulted, it is unlikely that she would have been admitted to the hospital to die one month later. *See id.*

The petitioner also argued that the assault caused the victim to become clinically depressed and suicide-prone. According to the petitioner, the victim committed suicide by refusing to eat, and that suicide was a superseding cause of the victim's death. *See id.* at 80–81. The Seventh Circuit rejected this argument, reasoning that "[t]he fact that a psychiatric condition, whether or not by precipitating suicide, is one of the causes of a victim's death does not excuse his

murderer.  Otherwise, it would be open season on sufferers from mental illness." *Id.* at 81 (citations omitted).  The court contrasted a chance occurrence, such as a fire at a nursing home, that *would* be a superseding cause if death resulted. *See id.* at 80.

Other circuits have also held that defendants are liable for murder notwithstanding additional occurrences.  For example, in *United States v. Swallow*, 109 F.3d 656 (10th Cir. 1997), the Tenth Circuit affirmed the defendant's murder convictions despite the defendant's argument that the district court erred in failing to provide a "proposed instruction characteriz[ing] an independent intervening cause as the unforeseeable gross negligence of a third party that relieves the defendant of responsibility for the death of the victim. . . ." *Id.* at 659 (citations omitted).  In rejecting the defendant's argument that negligence on the part of rescuers contributed to the victims' deaths, the Tenth Circuit held that "in cases involving death from injuries inflicted in an assault, courts have uniformly held that the person who inflicted the injury will be liable for the death despite the failure of third persons to save the victim."  *Id.* at 660 (citations and alteration omitted).

Similarly, in *United States v. Guillette*, 547 F.2d 743 (2d Cir. 1976), the Second Circuit held that the defendant was liable for the death of a victim who may have accidently triggered a bomb.  *See id.* at 747–48.  "The trial judge instructed the jury that even if [the victim] died accidentally through his own actions, the defendants would nonetheless be guilty of conspiracy with death resulting if [the victim's] death was induced or brought about by some act of a conspiracy in furtherance of the purposes of a conspiracy." *Id.* at 748.  The Second Circuit ruled that "[a] fundamental

principle of criminal law is that a person is held responsible for all consequences proximately caused by his criminal conduct. The concept of proximate cause incorporates the notion that an accused may be charged with a criminal offense even though his acts were not the immediate cause of the victim's death or injury." *Id.* at 749 (citation omitted). "In many situations giving rise to criminal liability, the death or injury is not directly caused by the acts of the defendant but rather results from intervening forces or events, such as negligent medical treatment, escape attempts, or the negligent or intentional acts of a third party." *Id.* "Where such intervening events are foreseeable and naturally result from a perpetrator's criminal conduct, the law considers the chain of legal causation unbroken and holds the perpetrator criminally responsible for the resulting harm." *Id.* (citations omitted); *see also United States v. Rodriguez*, 279 F.3d 947, 950–51 (11th Cir. 2002) (holding in the sentencing enhancement context that "one may be held criminally liable for a victim's death even where medical negligence or mistreatment also contributed to the victim's death") (citation omitted).

State courts have also consistently held that the defendant must demonstrate extraordinary medical negligence as the sole cause of death to break the causation chain. *See, e.g.*, *People v. Mars*, 985 N.E.2d 570, 575 (Ill. App. Ct. 2012), *as modified* ("The presumption [of causation] must be rebutted by the defendant's presentation of contrary evidence that the *sole* cause of death was the intervening gross negligence of physicians. Unskilled or improper medical treatment that aggravates a victim's preexisting condition or contributes to the victim's death is considered reasonably foreseeable and does not constitute an intervening act unless the treatment is so bad that it can be classified as gross negligence or

intentional malpractice. . . .") (citations omitted) (emphasis in the original); *State v. Shabazz*, 719 A.2d 440, 445 (Conn. 1998) ("The rule . . . that such gross negligence may permit the defendant to escape liability when it was the sole cause of the death, strikes an appropriate balance between the notions of criminal responsibility for one's conduct, on one hand, and intervening cause, on the other.") (citation omitted); *State v. Kirby*, 39 P.3d 1, 12 (Kan. 2002) ("It is clear that the physicians' actions were not so unusual, abnormal, or extraordinary that they could not have been foreseen. The physicians' negligence, if any, did not supersede the effect of the wounds inflicted by [the defendant] so as to become the sole legal cause of [the victim's] death."); *People v. Roberts*, 826 P.2d 274, 295 (Cal. 1992) (in bank), *as modified* ("If a person inflicts a dangerous wound on another, it is ordinarily no defense that inadequate medical treatment contributed to the victim's death. To be sure, when medical treatment is grossly improper, it may discharge liability for homicide if the maltreatment is the sole cause of death and hence an unforeseeable intervening cause. . . .") (citations omitted).

Given the weight of such consistent federal and state precedent, we conclude that Appellants failed to proffer any probative evidence that extraordinary medical negligence or Scopazzi's removal of his breathing tube was the sole cause of Scopazzi's death. Indeed, Scopazzi would not have needed medical care or a breathing tube absent Appellants' infliction of five stab wounds, including a wound that punctured Scopazzi's lung. The alleged medical negligence or removal of Scopazzi's breathing tube may have been "another cause of [Scopazzi's] death," but neither was a supervening event exonerating Appellants from the death resulting from their assault. *Brackett*, 11 F.3d at 80 (citations omitted). It was not sufficient for Appellants to simply

proffer some evidence of medical negligence or Scopazzi's removal of his breathing tube without otherwise satisfying the standard for proximate cause. *See Pineda-Doval*, 614 F.3d at 1034; *see also Guillette*, 547 F.2d at 749 ("Where such intervening events are foreseeable and naturally result from a perpetrator's criminal conduct, the law considers the chain of legal causation unbroken and holds the perpetrator criminally responsible for the resulting harm. This principle applies even where the direct cause of death is a force set in motion by the victim himself. . . .") (citations omitted).[6]

*United States v. Main*, 113 F.3d 1046 (9th Cir. 1997) does not compel a contrary result. In *Main*, we delineated the applicable standard for proximate cause involving an involuntary manslaughter conviction resulting from the defendant's reckless driving while intoxicated. *See id.* at 1047. In reversing the conviction, we held that the district court failed to properly instruct the jury that it must find that the defendant's acts were the proximate cause of the victim's death. *See id.* at 1049–50. We observed that "[a]ll of the authorities agree that to be guilty of involuntary manslaughter

---

[6] Consistent with its prior rulings on the government's motions *in limine*, the district court did not abuse its discretion when it denied Appellants' request to cross-examine Dr. Holt, the medical examiner, regarding his description of "the sequelae of puncture wounds" ultimately leading to Scopazzi's death. Appellants specifically sought to question Dr. Holt concerning Scopazzi's removal of his breathing tube, a sudden loss of blood, cardiac arrest, and brain swelling. Dr. Holt's testimony did not open the door to this additional medical evidence because Dr. Holt acknowledged that the complications "flowed from the fact that [Scopazzi] was stabbed." In any event, Appellants' proffer did not satisfy the proximate cause standard of complications "so extraordinary that it would be unfair to hold [Appellants] responsible for the resulting . . . death[ ]." *Pineda-Doval*, 614 F.3d at 1034 (citation and internal quotation marks omitted); *see also Brackett*, 11 F.3d at 80.

the harmful result must be within the risk foreseeably created by the accused's conduct; if the physical causation is too remote, the law will not take cognizance of it. . . ." *Id.* at 1049. We considered the foreseeability determination more difficult when the manslaughter charges stem from excessive speed or drunk driving because many individuals speed and/or drive while impaired without killing anyone. *See id.* Therefore, the foreseeability determination would require careful examination of the individual "conduct engaged in." *Id.* We held that reversal of the conviction was warranted because "[w]hen the jury is not told that it must find that the victim's death was within the risk created by the defendant's conduct an element of the crime has been erroneously withdrawn from the jury." *Id.* at 1050 (citations omitted).[7]

In stark contrast to *Main*, Appellants' convictions were not premised on the more ambiguous acts of "excessive speed or drunk driving." *Main*, 113 F.3d at 1049. Rather, Appellants' use of deadly weapons to directly inflict serious stab wounds carried the completely foreseeable risk that Scopazzi's injuries would result in death. Moreover, the district court included the concept of proximate cause in the

---

[7] We offered the following example of a sufficient intervening cause: "Suppose [the victim] had been pinned in the wreck and then eaten by a bear. His death would have been the result of the wreck; but for [the defendant's] driving, he would not have been killed, yet a jury could find as a fact that the death was not within the risk that [the defendant] had created. In the language of the American Law Institute death from a bear was not within the risk foreseeably created by the reckless driving[.]" *Main*, 113 F.3d at 1049 (citation omitted).

instruction on voluntary manslaughter, and the concept of foreseeability in other instructions.**[8]**

Because Appellants failed to demonstrate that any medical negligence or removal of a breathing tube was "so extraordinary that it would be unfair to hold [Appellants] responsible for the resulting . . . death[ ]," *Pineda-Doval*, 614 F.3d at 1034 (citation and internal quotation marks omitted), and because the jury instructions included the concepts of foreseeability and proximate cause, the district court acted within its discretion when it cabined the medical evidence.

## B. Evidence of Gang Affiliation

Appellants next contend that the district court erred in admitting irrelevant and prejudicial evidence concerning Appellants' alleged connection to the Mexican Mafia. Appellants also maintain that the district court erred in holding that the evidence's probative value outweighed any prejudice under Federal Rule of Evidence 403.

---

**[8]** Appellants' reliance on *United States v. Chouteau*, 102 U.S. 603 (1880) is also misplaced.  In *Chouteau*, the Supreme Court considered whether a distiller was liable for breach of certain bond conditions.  *See id.* at 608.  Within that context, the Supreme Court merely observed that "[i]f, for example, a party should charge another with inflicting upon his person a wound by which he lost an arm, it would be a good defence to show that the loss resulted from unskilful medical treatment or neglect and not from the wound inflicted.  So here, it is enough for the sureties to show that the loss to the government was produced by other means than the particular breach of duty by their principal, of which the government complains. . . ."  *Id.* at 609.  Needless to say, the law has evolved in the century-plus since *Chouteau* was decided.  *See Pineda-Doval*, 614 F.3d at 1034.

In *United States v. Santiago*, 46 F.3d 885 (9th Cir. 1995), we rejected an analogous evidentiary challenge. In that case, to establish the motive for the defendant's first degree murder of another inmate, the government introduced a cellmate's testimony that the defendant sought to become a member of the Mexican Mafia. *See id.* at 887–88. In affirming the district court's admission of evidence concerning the defendant's ties to the Mexican Mafia, we observed that the testimony did not violate Rule 404(b) because it "did not relate to other crimes," and it fell within the exception for evidence regarding motive. *Id.* at 888–89. "[T]he testimony relating to the Mexican Mafia was necessary to explain the reason that Santiago would kill a stranger – to be accepted into the gang – and to show how and why other inmates assisted him in obtaining the weapon." *Id.* at 889. We rejected the argument that the government's use of the testimony was a pretense intended to denigrate the defendant for his affiliation with a prison gang. *See id.* at 889–90. Because the evidence reflected that the defendant had expressed interest in the gang and had associated with gang members, including on the night before the murder, a sufficient foundation was laid to admit the testimony. *See id.* at 890.

We similarly conclude that testimony relating to the Mexican Mafia was relevant to Appellants' murder of Scopazzi, and that its probative value was not substantially outweighed by any prejudice. Although Appellants attempt to distinguish *Santiago* on the basis that the government did not present any evidence that Appellants stabbed Scopazzi based on their ties to the Mexican Mafia, the record supports a contrary conclusion. As in *Santiago*, the Mexican Mafia testimony was critical to the government's theory that Appellants did not act in self-defense and that their attack on

Scopazzi for seemingly insignificant acts of disrespect was motivated by their ties to the Mexican Mafia. *See Santiago*, 46 F.3d at 889–90. The government also introduced the kite from Murillo's cell that implied the attack on Scopazzi was motivated by Scopazzi's disrespect of the Sureños.

Appellants' trial was also permeated with references to their gang affiliations, and Agent Evanilla's expert testimony addressed the connection between the Sureños and the Mexican Mafia within the prison gang hierarchy. Given Appellants' admitted gang connections, the expert testimony concerning the Mexican Mafia and photographs of Appellants with members of the Mexican Mafia was not unduly prejudicial as "the Mexican Mafia was not the entire theme of the trial, so as to infect the trial with the threat of guilt by association. . . ." *Santiago*, 46 F.3d at 889 (citation, alteration, and internal quotation marks omitted). This is particularly true in this case where the trial focused primarily on the events that transpired in Scopazzi's cell and the jury was presented with numerous photographs and videos of the events without reference to Appellants' connections to the Mexican Mafia.

Notably, the district court also took several steps to minimize any undue prejudice. In particular, the district court permitted only "a limited number of photographs of [Appellants] posing with certain members of the Mexican Mafia" and "brief testimony by qualified witnesses regarding the hierarchy, customs, practices and tenets of the Mexican Mafia and its relationship and connection to the Sureños." The district court also committed to "include in its voir dire of prospective jurors examination on this subject and its effect, if any, on any juror's ability to judge the case fairly and objectively." Appellants rejected the district court's offer

to provide a limiting instruction concerning why the Mexican Mafia testimony was being admitted into evidence. *See United States v. Decoud*, 456 F.3d 996, 1012 (9th Cir. 2006) (rejecting evidentiary challenge in part because the defendant "did not take up the district court on its offer to provide the jury with a limiting instruction that could have mitigated, if not negated, [the defendant's] concerns").

We conclude that the district court did not abuse its discretion in admitting evidence pertaining to the connection between the Sureños and the Mexican Mafia as relevant to Appellants' motive in attacking Scopazzi. *See Santiago*, 46 F.3d at 889–90; *see also United States v. Major*, 676 F.3d 803, 810 (9th Cir. 2012) (holding that the district court did not abuse its discretion in admitting gang affiliation evidence as relevant to motive).

Appellants' reliance on *Kennedy v. Lockyer*, 379 F.3d 1041 (9th Cir. 2004), *as amended*, *Spivey v. Rocha*, 194 F.3d 971 (9th Cir. 1999), and *Dawson v. Delaware*, 503 U.S. 159 (1992) is misplaced as those cases are entirely distinguishable. In *Kennedy*, we did not address an evidentiary challenge to gang affiliation evidence. Instead, we held that a habeas petitioner was prejudiced because the attorney for his retrial was not provided a complete trial transcript that included the trial court's prior ruling excluding such evidence. *See Kennedy*, 379 F.3d at 1042–43. Because the prosecution elicited the precluded testimony in the second trial in violation of the trial court's prior order, we held that the petitioner was prejudiced in part because "where, as here, gang evidence is proffered to prove a substantive element of the crime (and not for impeachment purposes), it would likely be unduly prejudicial. . . ." *Id.* at 1056 (citation and internal quotation marks omitted).

In *Spivey*, we considered whether the trial court erred in excluding evidence of the witnesses' gang affiliation proffered by the defendant. *See Spivey*, 194 F.3d at 977. The trial court excluded the evidence because it did not support the defendant's assertion that the victim "was killed by a phantom killer" and there was already sufficient evidence of the witness's potential bias. *Id.* We held that, because the evidence was purely speculative, exclusion of the evidence did not render the defendant's trial fundamentally unfair. *See id.* at 979. Contrary to Appellants' assertion, *Spivey* did not hold that the prosecution was required to establish that gang affiliation was the actual motive for the murder. Instead, we articulated that, under California law, "[i]n order for evidence of another suspect to be admissible . . . there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime. Motive or opportunity is not enough. . . ." *Spivey*, 194 F.3d at 978 (citations and internal quotation marks omitted).

In *Dawson*, the Supreme Court held that evidence concerning the Aryan Brotherhood was inadmissible because it contravened the defendant's associational rights. *See Dawson*, 503 U.S. at 164–65. The Supreme Court opined that "the Aryan Brotherhood evidence was not tied in any way to the murder of [the defendant's] victim" and that "the inference which the jury was invited to draw . . . tended to prove nothing more than the abstract beliefs of [a particular Aryan Brotherhood] chapter. . . ." *Id.* at 166. Unlike in *Dawson*, the Mexican Mafia evidence in this case was "tied to the murder" of Scopazzi as evidence of motive.

## C. *Brady* and *Mooney-Napue* Claims

### 1. Non-Disclosure of A Tacit Agreement That Davis Would Receive A Sentence Reduction

Appellants posit that a new trial is warranted because the government's failure to disclose a tacit agreement to reduce Davis' sentence contravened *Brady*. "Under *Brady*, the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment." *United States v. Stinson*, 647 F.3d 1196, 1208 (9th Cir. 2011), *as amended* (citation and internal quotation marks omitted). "There are three components of a *Brady* violation: the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Id.* (citation, alteration, and internal quotation marks omitted). "To determine whether prejudice exists, we look to the materiality of the suppressed evidence. When looking to materiality, the question is whether admission of the suppressed evidence would have created a reasonable probability of a different result, so the defendant must show only that the government's evidentiary suppression undermines confidence in the outcome of the trial." *Id.* (citation and internal quotation marks omitted).

The record reflects that there was no *Brady* violation premised on Davis' cooperation. Although the government initiated the process under Federal Rule of Criminal Procedure 35 to reduce Davis' sentence on the same day the jury found Appellants guilty, we are unable to conclude that this temporal proximity alone establishes a *Brady* violation.

At trial, Davis testified that early termination of his sentence was possible based on his cooperation. Davis related that the letter agreement required that he testify truthfully and that the agreement did not provide any promises of leniency or a sentence reduction contingent upon the trial's outcome. As reflected by Davis' testimony, the government fully disclosed the letter agreement and the FBI interviews.[9]  Appellants failed to demonstrate that any of the government's post-verdict actions were inconsistent with the letter agreement or were premised on an undisclosed tacit agreement.[10]

We conclude that no *Brady* violation occurred because there was no tacit agreement to disclose. *See United States v. Price*, 566 F.3d 900, 910 n.11 (9th Cir. 2009) ("If the record is conclusive that all relevant agents of the government did *not* know about the *Brady* material, then, of course, no *Brady* violation has occurred as the government has no obligation to produce information which it does not possess or of which it

---

[9] Appellants maintain that Davis falsely denied that he expected any leniency based on his testimony. However, Appellants have not presented any evidence of a tacit agreement for leniency or that Davis was aware of any such agreement.

[10] Appellants' reliance on *Sivak v. Hardison*, 658 F.3d 898 (9th Cir. 2011) is unavailing. In that case, the witness testified that certain charges were dismissed but "he did not know whether the prosecutor's office was involved in the dismissals." *Sivak*, 658 F.3d at 904. The witness also testified that he cooperated based on fears for his family's safety and that he was not "seeking any particular favoritism from State authorities in exchange for his testimony . . ." *Id.* at 903 (internal quotation marks omitted). We held that there was a *Brady* violation based on undisclosed letters reflecting a tacit agreement for leniency. *See id.* at 909–10. Davis, unlike the witness in *Spivak*, acknowledged that he hoped that his cooperation would result in a sentence reduction and no tacit agreement for leniency was unearthed.

is unaware. . . .") (citation and internal quotation marks omitted) (emphasis in the original). The district court also cautioned the jury that Davis "may have received, or may receive, benefits from the government in connection with this case" and that the jury should examine Davis' testimony "with greater caution than that of other witnesses."[11] Davis' credibility, therefore, was significantly undermined irrespective of any tacit agreement for a sentence reduction.

### 2. Non-Disclosure of Davis As A DEA Informant

Appellants also argue that a new trial is required because the government failed to disclose that Davis served as a DEA informant.

Although it is arguable that the government was required to disclose this information as impeachment evidence, *see United States v. Si*, 343 F.3d 1116, 1123 (9th Cir. 2003) (observing that "these [informant] reports can be considered favorable to [the defendant] because, as information about [the witness's] ongoing informant activities, they would constitute impeachment evidence tending to show [the witness's] motives in testifying for the government"), its disclosure would not "have led to a different result. . . ." *United States v. Olsen*, 704 F.3d 1172, 1184 (9th Cir. 2013) (citation omitted). As discussed, Davis' credibility was sufficiently undermined by the defense, given his admitted cooperation with the prosecution, his extensive criminal

---

[11] Appellants maintain that the district court's instruction was ineffective because it required the jury to speculate. However, it is unclear how the district court's instruction was ineffective as it specifically cautioned the jury about the potential impact of any benefits Davis received for his cooperation.

history, and his illicit prison activities. Although the DEA report may have further demonstrated Davis' willingness to cooperate with the government, Appellants do not point to any benefits that Davis received from his cooperation, particularly as Appellants do not rebut the government's representation that Davis was never classified as a DEA informant. "The cross-examination of [Davis] raised reasonable doubts as to his motivation for testifying and there was sufficient impeachment evidence for the jury to question seriously the veracity of [Davis'] original statement. Thus, regardless of the failure to disclose the informant status of [Davis], [Appellants] received a trial resulting in a verdict worthy of confidence." *Gentry v. Sinclair*, 705 F.3d 884, 905 (9th Cir. 2013), *as amended* (citation and internal quotation marks omitted); *see also Si*, 343 F.3d at 1123 (holding that information of witness's role as an informant in unrelated cases was not material).

### 3. *Mooney-Napue* Violation

Appellants contend that the government knowingly failed to correct Davis' false testimony that he was not promised a sentence reduction in violation of *Mooney* and *Napue*.

"A conviction obtained using knowingly perjured testimony violates due process, even if the witness's perjured testimony goes only to his credibility as a witness and not to the defendant's guilt." *United States v. Houston*, 648 F.3d 806, 814 (9th Cir. 2011) (citations omitted). "The government's failure to correct testimony that it later learns is perjured is also a *Mooney–Napue* violation." *Id.* (citation omitted). "To prevail on a *Mooney–Napue* claim, the defendant must show that (1) the testimony was actually false, (2) the prosecution knew or should have known that the

testimony was actually false, and (3) that the false testimony was material." *Id.* (citation, alteration, and internal quotation marks omitted). "In assessing materiality under *Napue*, we determine whether there is any reasonable likelihood that the false testimony could have affected the judgment of the jury; if so, then the conviction must be set aside. Under this materiality standard, the question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id.* (citation omitted). "However, if it is established that the government knowingly permitted the introduction of false testimony reversal is virtually automatic." *Id.* (citation omitted).

Appellants' *Mooney-Napue* claim is premised on their contention that there was a tacit agreement that the government would assist Davis in receiving a sentence reduction based on his favorable testimony. However, Appellants failed to proffer any evidence of a tacit agreement, particularly as the government's post-verdict actions were consistent with the fully disclosed letter agreement and with Davis' testimony that the letter agreement was not contingent upon the trial's outcome. Appellants are unable to demonstrate that Davis' testimony "was actually false" or that "the prosecution knew or should have known that the testimony was actually false . . ." *Id.* (citation omitted). Thus, a new trial was not warranted.[12]

---

[12] Although Appellants maintain that cumulative error warrants a new trial, there were no errors, cumulative or otherwise, requiring reversal of Appellants' convictions. *See Pineda-Doval*, 614 F.3d at 1036 (holding that even if the defendant had been permitted to introduce evidence

## IV.    CONCLUSION

The district court's exclusion of evidence concerning medical negligence and Scopazzi's removal of his breathing tube does not warrant reversal of Appellants' convictions. Appellants failed to demonstrate that any medical negligence related to Scopazzi's multiple stab wounds and his removal of his breathing tube were the sole causes of Scopazzi's death or were so extraordinary and unforeseeable as to absolve Appellants of liability for their vicious assault.  The district court did not abuse its discretion in admitting evidence of Appellants' connections to the Mexican Mafia to demonstrate Appellants' motive for murdering Scopazzi.  Expert testimony concerning the connections between the Sureños and the Mexican Mafia within the prison gang hierarchy and photographs of Appellants with Mexican Mafia members did not render their trial unfair because the district court properly minimized any prejudice stemming from the evidence and Appellants' trial was replete with admissible evidence regarding Appellants' gang affiliations.  Appellants also failed to demonstrate that a new trial was warranted based on the government's failure to disclose immaterial information regarding Davis' sentence reduction and his cooperation in a DEA investigation.

**AFFIRMED.**

---

concerning proximate cause, "[t]here was no prejudice, cumulative or otherwise").